Carl Arthur Deckert, Plaintiff-Appellee, v. Chicago & Eastern Illinois Railroad Company, Defendant-Appellant.

## Term No. 54–O–13.

Fourth District.

February 1, 1955.

Rehearing denied February 23, 1955.

Released for publication March 3, 1955.

Burroughs, Simpson & Burroughs, Gordon Burroughs, of Edwardsville, for appellant; Patrick C. Mullen, of Chicago, and Harold G. Talley, of Alton, of counsel.

Listeman and Bandy, of East St. Louis, and Miller & Pfaff, of Salem, for appellee.

MR. JUSTICE SCHEINEMAN delivered the opinion of the court.

The plaintiff, Carl Arthur Decker, while employed by the defendant railroad in a roundhouse, fell from a height of about 20 feet onto a concrete floor and suffered severe injuries. He brought this suit, alleging that the Federal Employers Liability Act (45 U. S. C. A., secs. 51–59) applied, and charged that the defend-

ant was negligent in furnishing him with incompetent help and in failing to furnish a reasonably safe place to work, and that defendant failed to furnish any reasonable safeguard or protection against falling.

The trial resulted in a verdict for plaintiff for $12,000 and, after the court overruled defendant's several motions, judgment was entered on the verdict. On this appeal the first point presented is that a verdict for defendant should have been directed, on the ground that plaintiff was not employed in interstate commerce or in furtherance thereof, and his duties did not directly or closely and substantially affect such commerce.

It was stipulated that locomotives used in interstate commerce were commonly serviced in this roundhouse in preparation for interstate movement. Plaintiff's usual employment was that of mechanic and welder on interstate equipment. On the day in question, and for some time prior thereto, he had been assigned the particular task of cutting with a blowtorch some metal pipe which was slung a few feet below the roundhouse ceiling. This was part of equipment formerly used to supply hot water to engines, but it had not been used for some years and was being removed and junked. The company's carpenter gang was removing the heavier equipment while plaintiff cut the pipe into lengths convenient for handling.

There was also some disputed testimony that the pipes had deteriorated and were flaking off, also that they were only about five feet above the top of an engine in a stall, and interfered with headroom of men servicing engines.

Whether this plaintiff was engaged in interstate commerce is a phase of a problem which has troubled the courts ever since the origin of the act. Its importance arises from the fact that Congress is without authority to legislate in this field, unless it concerns interstate commerce. The problem, naturally, is most

486

acute when the employee is not engaged in the actual movement of trains.

Without attempting to cite the numerous cases on the subject, it may be said that, with respect to new construction of facilities to be used by the railroad, prior to their actual use, construction employees were generally regarded as not coming under the federal act. With respect to maintenance of existing facilities used in interstate commerce, some cases held the maintenance employee came under the act, others held he did not.

In 1939 the Congress amended the act to include employees whose duties were "in furtherance of" interstate commerce, or which closely and substantially affect it. No doubt this was intended to clarify the situation, but conflicting decisions in various state and federal courts continue to abound. Accordingly, this opinion is confined substantially to precedents in Illinois.

In Ernhart v. Elgin J. & E. Ry., 405 Ill. 577, the court considered the case of a switchman who sometimes worked with interstate cars, but, at the time of his injury he was with a string of cars for purely local use. It was held that this switching operation would have some effect on other movements of cars to be used interstate, and that he was under the act. Many foreign precedents were analyzed; in one of these, a workman was electrocuted while repairing a door of a roundhouse used for interstate engines, and this was held to be under the act. The Illinois court concluded that the usual employment of a plaintiff is not decisive, if he has been injured on a temporary assignment of purely local character, but from its study of many cases, the court also found "a liberal attitude in construing the employment engaged in at the time as being in furtherance of interstate commerce."

In Walden v. Chicago & N. W. Ry., 411 Ill. 378, the employee was engaged in maintenance or repair of a

bridge used for vehicular traffic. No trains operated upon it, but it spanned a number of tracks used for interstate trains, and this was held to be work in furtherance of interstate commerce.

In Illinois Cent. R. R. Co. v. Industrial Commission, 414 Ill. 546, a laborer had dug a ditch to drain water away from the location of a switch to avoid ice accumulation. He had broken up some planking in the process and went to secure a new plank. While carrying a plank he was injured. He had nothing to do with the operation or the maintenance of the switch itself, but only with surrounding conditions. It was held he was engaged in furtherance of interstate commerce.

██ These decisions suffice to indicate that repair and maintenance in good working order of facilities of the railroad is regarded as in furtherance of interstate commerce, even though the facilities are fixed and immovable, provided only that they are used in the service of such commerce. And in our opinion, the removal of damaged or obsolete equipment from the roundhouse is as much a part of proper maintenance thereof as any other type of renovation and repair designed to keep the roundhouse suited to current needs.

The next point urged is that there was no evidence of negligence on the part of defendant, and that the facts show plaintiff's injury occurred by reason of his own negligence. There is no substantial dispute over the following:

There were four pipes which ran from one end of the building around its curvature to the other end, with connections to the boiler room about midway. These four lines were parallel and in the same horizontal plane near the ceiling and 20 feet above the floor, and they were close enough together to form something in the nature of a platform between three and four feet wide. As we understand it, at the place where plaintiff

was hurt, the pipes changed direction at an angle of 45 degrees, probably to conform to the shape of the roundhouse.

Plaintiff was supplied with a torch cutting outfit and told by his foreman to cut the pipes. The foreman then departed without supplying plaintiff with anything to stand on for his work. There was no platform, scaffold or planking, and only one ladder which was not long enough to reach the pipes where the work was to be done. A helper was furnished from the carpenter gang.

To comply with his orders, the only method plaintiff was able to devise was to place the ladder against the wall near the pipes, climb to the top of the ladder and then draw himself onto the pipes. They were so close to the ceiling he had to lie at full length upon them. Thus his weight of 175 pounds was supported only by the pipes he was to cut. The hazard of the operation is readily apparent.

Since plaintiff was on top of the pipes and unable to see the under side, the helper standing below would signal him before the cut was clear through. Until noon of the day of his injury, the helper was an experienced man who co-operated and the work progressed without accident. That last afternoon a different helper came, with whom plaintiff was not acquainted. As plaintiff made his first cut the helper did not warn him and the cut went too deep. Plaintiff testifies that he learned afterward that the cut went clear through, but he did not know it at the time.

After the first cut, plaintiff shifted his position to make another cut some 7 or 8 feet from the first. This pipe was the outer one at his left, and had the deep cut in it. As he applied the flame and made a partial cut with his left side partly supported by this pipe, it suddenly twisted or rolled so that the point of the 45-degree angle turned from its horizontal position

489

through 90 degrees to point downward. As it rolled from under him, he lost his balance and fell to the concrete floor.

It was established at the trial that the helper that afternoon was inexperienced, he had never worked with a welder before and did not know what he was supposed to do.

■ The employer's duty is to use due care to provide the employee with a safe place to work, and, if a carrier is not guilty of any negligence, it is not chargeable with failure to provide a safe place to work. Payne v. Baltimore & O. R. Co., 351 Ill. App. 186. The carrier must use reasonable care to provide suitable appliances and equipment with which the work is to be performed. 56 C. J. S., Master & Servant, sec. 226, p. 951.

■■ In Margevich v. Chicago & N. W. Ry. Co., 1 Ill.App.2d 162, 166, the rule is thus stated: "Defendant was not required to furnish the latest, best or most perfect appliances. The general rule imposes the obligation to furnish reasonably safe equipment suitable for the purpose of the work, and where occupations are attended with great and unusual danger, the obligation is to use all appliances readily attainable for the prevention of accidents. The rule applied under the F. E. L. A. is that the employer's duty becomes more imperative as the risk increases." Citing Bailey v. Central Vermont Ry., Inc., 319 U. S. 350.

The foregoing Margevich case involved the use of a type of ladder which gave an insecure footing for work of prying with a crowbar, and it was held a question for the jury whether the carrier was negligent in failing to furnish reasonably safe equipment.

Even under common-law principles, an employer might be held liable for failure to furnish "an instrumentality such as a scaffold, where the employer ought to have anticipated that the calamity would result

from the employee's working without the appliance." 35 Am. Jur., Master and Servant, sec. 188.

Regardless of the question of the adequacy of the help provided in the case at bar, it seems obvious that the jury could properly find the defendant guilty of negligence in failing to provide a safe place to work and suitable appliances, in assigning work 20 feet above the floor with nothing whatever for the employee to stand upon, or support his weight, other than the pipes he was ordered to cut away.

Indeed, the risk of falling is so obvious that defendant argues it was plaintiff's, as well as defendant's, duty to perceive it. The evidence is undisputed that plaintiff was ordered to do the work and provided with no means of doing it, other than the one used. Of course, he could (at least in theory) have refused to perform the assigned task. While the defendant does not state it in plain words, this argument necessarily implies that the plaintiff assumed all the risk, when he undertook to do the work without adequate equipment and appliances.

The F. E. L. A. provides that the employee "shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents or employees of such carrier."

Notwithstanding the wording "in whole or in part," there is no doubt that there are some decisions which support defendant's position that a visible risk is assumed, even though caused in whole or in part by the carrier's agents and employees, who have failed to do what a reasonably prudent man would do under the circumstances. Other cases have expressed a different view. The United States Supreme Court has construed the quoted wording as "completely abolishing the defense of assumption of risk in actions under the act." Lilly v. Grand Trunk W. Ry. Co., 317 U. S. 481, 87 L. Ed. 411, 63 S. Ct. 347.

It has also been said that Congress, in abolishing the defense of assumption of risk, did not mean to leave open the identical defense for the master by changing its name to "non-negligence." Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 87 L. Ed. 610, 63 S. Ct. 444, 143 A. L. R. 967.

These decisions do not abolish the requirement of negligence of defendant as a basis for liability, nor do they mean that the carrier is liable for every injury that arises by reason of the hazards of the employment. Payne v. Baltimore & O. R. Co., 351 Ill. App. 186.

Any employment involving physical activity is attended with some possibility of injury. The common law often absolved the employer of liability on the ground that the employee assumed the ordinary risks of his occupation. This approach to the problem was wholly unnecessary and has led to needless confusion; it would have been simpler to say that such risks were natural and inherent, and not due to negligence of the employer. The latter approach is mandatory under the F. E. L. A., so that, the carrier is liable for its negligence, and that of its other agents and employees, or for violations of statutes, but not otherwise, and the question of assumed risk has nothing to do with the case.

Here, the defendant exposed its employee to an unreasonable and unnecessary risk, which could have been avoided by simple and reasonable precautions, such as providing a place for the employee to stand and support his weight while doing the work. Possibly the common-law doctrine of assumed risk would have been extended to cover such a case, on the ground the risk was visible and the employee could have refused to proceed, even if that meant changing his employment. The harshness of such a theory under modern conditions is self-evident, and is the basic reason for enactment of statutes abolishing it.

492

If a workman is provided with a safe method of doing his work, but selects another and more hazardous method, it might be said that he has voluntarily assumed a risk, but even in such case it might better be said that the employer has discharged his duty by providing a safe method, and therefore was not negligent.

Defendant quotes at length from Wadiak v. Illinois Cent. R. Co., 208 F.2d 925. It was there held, under the facts, that the plaintiff had voluntarily adopted a dangerous method of doing his work instead of a safe one. It was held the law imposes no liability where plaintiff had a choice of methods and nothing was done by the defendant to cause injury in the method voluntarily chosen by plaintiff. The court said of plaintiff: "He was not injured because he did not have equipment, for he had access to sufficient and adequate tools and devices. He was injured because he saw fit not to use the equipment but to ignore it."

In the case before us the plaintiff was not given a choice of using or not using available equipment. It is undisputed that there was nothing whatever available upon which he could stand while working aloft. The cited case is not in point on these facts.

The defense also presented a statement signed by plaintiff which included a printed question and typed answer as follows: "In your opinion, was there any defect in Track, Cars, Engine, Tools, Machinery, or other appliances or place where you were working, or any carelessness on the part of the Railroad or anyone in the Railroad's employ tending to cause the accident? If so, what or whom? Answer: no."

The jury could properly construe this as an admission that the ladder, goggles, tanks, torch, etc., were not defective, without necessarily admitting that other suitable and necessary appliances were available. In fact, it would be somewhat unreasonable to accept this statement as proof that necessary and suitable

equipment was available, and the place to work was safe, in the face of the undisputed facts.

Accordingly, it is held that the plaintiff did not assume the risk caused by the failure to furnish a safe place to work or any suitable appliances for the assigned task. The jury could properly find such failure was negligence on the part of the defendant which proximately caused the injury, that defendant in the exercise of ordinary care, should have anticipated the calamity, and that there was no contributory negligence on the part of the plaintiff.

Other points are made by appellant, all of which have been examined and considered, but we cannot undertake to review them all at length in this opinion.

One objection was to the effect that a physician had been permitted to testify to an opinion based only on the statements made to him by the plaintiff. We have examined this testimony and find that the physician made it clear he did not base his opinion on such statements, but upon his own examinations and tests.

It is also contended the verdict is excessive, and that the plaintiff has no permanent injuries. Moving pictures were exhibited showing the plaintiff engaged in labor about his home under construction. A good recovery is indicated, at least to the extent that plaintiff has the use of his limbs. On the other hand, his statements that he cannot resume his former employment is supported by other matters in the record, and it appears he can do only light work.

Plaintiff's testimony that he continues to suffer pain resulting from the injuries sustained does not appear unreasonable or unbelievable, and the medical testimony was adequate to support his claims. We are unable to say that the verdict is excessive, and there is nothing to indicate that it is the result of passion and prejudice.

Finding no reversible error in the record, the judgment is affirmed.

Judgment affirmed.

CULBERTSON, P. J. and BARDENS, J., concur.