[Civ. No. 19008.   First Dist., Div. One.   Feb. 14, 1961.]

EDWIN J. CLARY, Appellant, v. SOUTHERN PACIFIC
COMPANY (a Corporation), Respondent.

0

0

Perkins, Carr & Eddy for Appellant.

Marshall Ricksen, Ricksen, Hogan, Snook & Vendt, Arthur B. Dunne, G. Blandin Colburn, Jr., and Dunne, Dunne & Phelps for Respondent.

WOOD (Fred B.), J. pro tem.*—Plaintiff seeks damages under the Federal Employers' Liability Act for personal injuries received while employed as a carman in defendant's shops at Sparks, Nevada. The verdict was for the defendant and plaintiff has appealed. He claims insufficiency of the evidence and errors of law in the refusal of certain instructions.[1]

He was injured while engaged in the removal of a draft gear and yoke from a drop bottom gondola car. The gear and yoke weighed about 400 pounds and rested on a tie strap which was riveted to the center sill of the car.[2]

His foreman told him to assist two other workmen, Treadway and Grassini, on a track used for heavy repairs. He knew these men were engaged in removing a draft gear. He could see their activities from the place where he had been working. He had observed them trying to remove the draft gear from the east end of the car. They were still hammering to get the draft gear to drop down when he arrived. The coupler had been removed from the draft gear at the west end of the car. Plaintiff went on a personal errand and when he returned the two men were working on the west end of the car. The trucks had been removed and the car put on air jacks which later had been replaced by standees.

---

*Assigned by Chairman of Judicial Council.

[1] He also appealed from the order denying his motion for new trial, which appeal must be dismissed because such an order is not appealable.

[2] A draft gear is located on the underside of the car at each end. It is the apparatus into which the coupler fits. The draft gear fits into the yoke which is 3 or 3½ feet long. The gear and yoke are housed underneath the center sill and held in place by a tie strap, a metal bar attached to the under side of the sill by six rivets.

Upon removal of the tie strap the gear and yoke would fall to the ground unless the compression of the fit caused the unit to be stuck against the sides of the sill.

Treadway was underneath the car burning the heads off the rivets that held the tie strap in place.

Treadway came out from under the car and Grassini said, "I believe this is going to be just as tough as the other end was to get down." Plaintiff then took the drift pin and ball peen hammer which were at the job and crawled underneath the car to knock out the rivets. He put the pin against one of the rivets, hit it a couple of times, and the entire assembly broke loose and fell to the ground, thrusting the pin against the sill, pinching plaintiff's hand.

He testified he did this job the same way he had observed others doing it at Sparks. Though he had never before removed a tie strap himself and had never received instructions as to how to remove a draft gear, he had seen others do it. Draft gears were removed quite often at Sparks. Upon deposition he had testified, first, that he had not helped drop draft gears many times before, he had helped put them up more than he had dropped them; then he said he could not remember having helped drop them before this occasion. He admitted he was an experienced carman. He had received his mechanic's papers. He testified that a carman is a man that does all things about a freight car, repairing freight cars; he used a rivet gun, crowbar, reamer, sledge hammer; to be qualified to be a carman you are supposed to be able to do all those tasks.

Plaintiff contends that the evidence demonstrates, as a matter of law, that defendant was negligent in requiring him to remove the rivets, loosen the tie strap and lower the gear without furnishing a jack or other device suitable to hold the gear without the risk of its suddenly falling to the ground.

However, the jury need not have inferred that such a device was unavailable. Jacks had been used that day to aid in the removal of the trucks from this very car and plaintiff knew it. He admitted that he made no search for an air jack on this job. His excuse was that he was in a hurry; also, he thought the jacks were all in use, and he never saw one of them used for this purpose at Sparks. Moreover, he did not believe those air jacks suitable for lowering draft gears because he considered the head too small and the gear might tilt when being lowered. He described the size of the head in terms of the size of a circle on an ash tray shown him, but the size of the circle on the tray is not in the record. The jury may well have deemed that size of head quite sufficient,

at least adequate to hold the gear in place while the rivets were being removed.

Moreover, no one told plaintiff to do this work in the manner in which he did it, or in any particular manner, and the workmen he was sent to assist had no superior status. He and they had equal status as carmen. Without making any inquiry or protest he went ahead on his own. It is a fair inference that the force that injured him was a force which he released or turned loose upon himself unaided and unimpelled by any other person or agency. He admitted that he was an experienced car repairman. The jury reasonably could have found that his foreman justifiably assumed that plaintiff could safely perform this task, an assumption which might not have been reasonable if plaintiff had been a mere helper or apprentice. The jury may well have concluded that plaintiff merely used bad judgment, that is, he concluded that the gear was stuck and would not drop upon removal of the rivets, so he failed to take appropriate precautions.

Interestingly enough, when excusing his own conduct plaintiff says he was not "aware of any danger" in the method he used, but when asserting that defendant was negligent he says that "the dangers of this method . . . are obvious." The jury may well have concluded that the plaintiff had a choice of ways of doing the work, one obviously fraught with danger and risk of injury to himself, the other not; that he voluntarily chose the unsafe or more dangerous way, one that would have been avoided by a man of ordinary prudence; and that such choice was the sole cause of his injury. That would be within the scope of the principle enunciated and applied in *Smith* v. *Southern Pac. Co.*, 138 Cal.App.2d 459 [292 P.2d 66], which, as stated therein, ". . . does not in effect apply the principle of contributory negligence nor the doctrine of assumption of risk. . . ." (P. 464.) (See also *Rogers* v. *Southern Pacific Co.*, 172 Cal.App.2d 493, 497 [342 P.2d 258].) Plaintiff puts heavy reliance upon *Deckert* v. *Chicago & Eastern Illinois Railroad Co.*, 4 Ill.App.2d 483 [124 N.E.2d 372], and *Fox* v. *New York Central Railroad Co.*, 267 F.2d 532, but each was an affirmance of a judgment for the plaintiff and, therefore, not especially helpful here.

We conclude, as did the trial judge when he denied the motion for new trial, that the verdict is supported by substantial evidence.

■ Plaintiff asserts error in the refusal to give certain instructions requested by him. We perceive no error in such

refusal. With one exception they were covered by instructions which the court did give. The exception was an instruction to the effect that under the Federal Employers' Liability Act the employee does not assume the risk of his employment. There probably would have been no harm in giving it. On the other hand we see no need to give it. The jury was adequately instructed upon all elements involved and the assumption of risk doctrine was not one of them. Defendant did not plead assumption of risk; no one contends there was assumption of risk; and there is no suggestion that assumption of risk was in any way suggested to the jury.

An instruction that the defendant owed a duty of care "in providing a reasonably safe means of doing the work in question and in establishing a reasonably safe system for doing the work in question" was really another way of expressing the duty to use care to provide reasonably safe and suitable tools, machinery and appliances and to furnish a reasonably safe place to do the work, more clearly expressed, we think, in the language of B.A.J.I. Numbers 303, 303A and 301A, which the court did give. The gravamen of plaintiff's complaint is the asserted failure to furnish a suitable air jack or other device to hold the draft gear while removing the tie strap and to lower it upon such removal.

A requested instruction that the defendant "owed a duty to use ordinary care in providing its employees with such equipment as was reasonably necessary to remove the draft gears in question with reasonable safety to its employees," was adequately covered by B.A.J.I. Number 303.

Requested instructions that the defendant owed a duty of care in "instructing its employees in the performance of their work" and in providing "adequate supervision" for them were covered, more appropriately we think, by the instructions given on negligence, ordinary care and related topics.

The judgment is affirmed. The appeal from the order denying a new trial is dismissed.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied March 3, 1961, and appellant's petition for a hearing by the Supreme Court was denied April 12, 1961.