THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FELIX G. MENDOZA, Defendant-Appellant.

First District (4th Division)   No. 77-1247

Opinion filed July 13, 1978.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and Ira H. Raphaelson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The appellant Mendoza was charged with another defendant, Ayala, in September 1975 with the May 30, 1975, armed robbery of Fidel Balcazar. Prior to trial both defendants moved to suppress as evidence objects[1] seized by the police after the defendants' arrest claiming the seizure was illegal. This motion was denied after an evidentiary hearing. The defendants each waived their right to a jury trial. The court found them guilty of the lesser-included offense of robbery. Both defendants were sentenced to a period of from one to three years' imprisonment in the Illinois State Penitentiary. Only the defendant Mendoza has appealed.

On his appeal Mendoza contends:

(1) that the judge erred in finding the seizure of the objects proper and therefore in refusing to suppress them as evidence.

(2) that the judge erred in allowing the admission of certain knives in evidence although there was insufficient evidence to connect them either to the crime charged or to the defendant.

(3) that the appellant's guilt was not shown beyond a reasonable doubt.

Since if the latter contention is true, we need not consider the others but must simply reverse without remanding for a new trial, we will consider the defendant's contentions in reverse order.

Because of the nature of the contentions raised we believe it desirable to set forth the facts of the crime and subsequent events in considerable detail. At trial the People presented the testimony of Fidel Balcazar, the victim, Marco Luevano, the victim's brother-in-law and Officer Lara. The

---

[1] Two knives and a watch.

defense also presented testimony by Officer Lara. Additionally, the defense presented the testimony of Officer Delfinio Bustos and each defendant took the stand in his own behalf.

Fidel Balcazar testified, through an interpreter, that on May 30, 1975, he lived at 2843 West 22nd Place with his family. On that date around 11:30 in the evening he was walking alone west on 22nd Street to his house on the south side of the street. When he got to within three houses of his own, he was stopped by five Mexicans who had been behind him. Two of them grabbed him and told him to give them his money. The other three got in front of him. Of the two who grabbed him, one grabbed his arms, and the other put a knife to his left side. The men in front of him were three feet away, closer when they came for the money, and were 17 to 19 years old.

Balcazar described the clothing of the three men who were in front of him. One "had a pink shirt, short and blue slacks, had a little bit of mustache, not too much goatee, just a little bit here (indicating)." Balcazar identified this one as defendant, Ayala. The man in the middle was bigger with a light shirt, dark slacks and handkerchief on his neck. The man in the middle, however, was not in court. The third man, whom Balcazar identified as defendant Mendoza, was wearing "dark brown slacks and a shirt, 'T' shirt, brown, and a shirt with his short." He was also described as white, thin, with a goatee and mustache.

When the individuals approached Balcazar, they wanted his money. They came near and tried to take it out of his pockets. As they started to go through his pockets, Balcazar tried to get away and fight them. The two held him and three hit him on his body. When he was on the ground, they kicked him. In addition to taking his money and wallet, his assailants took his gold Timex calendar watch with a white band. Balcazar saw his attackers running east and after 1 to 1½ minutes, he gave chase. They got into a car parked at the corner. Balcazar knocked on the window and said he wanted his wallet and documents back. Someone told him to face the wall and tossed him his wallet. He could not see their faces because they were ducking down. Balcazar then went home. When Balcazar got home he saw his brother-in-law, Marco Luevano, standing in front of his home. Luevano said he would call the police.

Balcazar also described the lighting conditions where he was robbed. In the door of his house, three doors down, there was a light. There are street lights 25 to 30 feet apart along the street. The first light was about 20 feet away from where he was robbed, or about half a house away.

The police did not come until May 31. That afternoon he spoke with two uniformed police officers for about 10 minutes and Balcazar told them he had been robbed and his watch had been taken. The officers made a report. About an hour later, Balcazar saw two other policemen and spoke with them about 10 minutes. One of them was Officer Lara.

Two to 2½ hours later, Lara came back to Balcazar's house and showed him a watch and asked him to come to the police station to see some men. Balcazar identified the watch as his. Balcazar described the watch as gold with a white band and loose head. It also couldn't be wound very well.

About 45 minutes after his second conversation with Lara, Balcazar went to the police station. At the station he went into a small room. A door was opened and he saw eight men all lined up. He recognized two of them, Ayala and Mendoza. The two were wearing the same clothes they had been wearing the night before when they beat him up.

On cross-examination Balcazar testified that on that night he was coming home from a movie. Balcazar heard but did not see the five men behind him until they grabbed him. The first time they hit him was when he tried to break loose. Between being grabbed and being struck the first time was about two minutes. Balcazar stated none of the three men in front of him had knives. He also said that he never saw the knife at his side or any weapons all that evening. Balcazar testified that he remembered what the three men in front of him were wearing but did not remember telling Ayala's attorney differently at a pretrial meeting. Balcazar admitted never giving Officer Lara or any other officer a description of the assailants' clothes.

The description Balcazar gave the uniformed policemen was of male Mexicans of average height and weight with long hair. Balcazar stated that he had told defense counsel that long hair went to the shoulder. He also stated, though, that "[n]one of them had hair like mine which that is what I believed to be short hair." Later on he stated that he felt all the men in the lineup had long hair. Balcazar went on to say that Ayala did not have shoulder-length hair at the lineup. Balcazar said that one man had a mustache and another had a mustache and a "beard here." In describing "here," Balcazar touched his chin area only. The man with the mustache had a little hair on his chin. Only two of his attackers had shoulder length hair, but almost all of them had hair below the neck. One of the men with long hair was the large man in front of him. Balcazar stated that his attackers were about 5'8" and 160 and 180 pounds except for the bigger man in front. The larger man was 3 or 4 inches taller. Balcazar didn't "get to know" the larger man well but said he did get that chance with the other two in front of him, the defendants, because they came in close to take his money.

Marco Luevano testified that on May 30, 1975, he was living on 2943 West 22nd Place. Around 11:30 at night he got a phone call. The caller did not identify himself. The call lasted about 15 seconds. After the call, he ran out in the street and about 10 to 15 feet away he saw his brother-in-law, Fidel Balcazar, who was "pretty well beat up" and holding himself by a fence. Luevano saw no one else on the street. He ducked down when

he saw a black-over-red Pontiac coming westbound. The car was going fast. There was one other car on the street going east. As the westbound car passed he took down the license plate number, WE 5884. Luevano further testified that Balcazar told him nothing about banging on the car window or asking for his wallet back. However, Luevano did say Balcazar told him that about five "guys," one with a knife, beat and robbed him. Luevano did not see his brother-in-law wearing his watch when Luevano saw him although he knew his brother-in-law did wear one. He also testified that he had not seen People's Exhibit 1 for identification, the watch, before.

After helping Balcazar back to his house, Luevano called the police who did not respond. After returning from work the next day, Luevano called the police again. About 30 minutes later two policemen arrived. Luevano spoke with them, told them of the robbery, and gave them the license plate number.

When the police came, they spoke to Balcazar and Luevano in English. Luevano translated. All Luevano could remember of Balcazar's description of his assailants to the police was that one had a "goat" beard, wore a pink shirt and blue pants and the other wore a light shirt, turtle sleeves and with a brown "T" shirt and brown pants. Luevano stated he had seen the lineup photograph before trial.

Officer Louis Lara testified that after he went into 2924 West 25th Place, he recovered Balcazar's watch from the bedroom floor. That watch was next to a mattress and was about four feet from Ayala. Lara testified, also, that there were no other clocks in the room. Chain of custody was stipulated as to the watch. Lara also testified that he recovered two folding knives from the kitchen table. One knife had a black handle, the other a small brown handle. Chain of custody was then stipulated as to the knives. Balcazar did not identify either knife. Finally, Lara testified that he had not seen either the watch or the knives in Mendoza's possession.

Defendant Mendoza stipulated his age as being 24. The watch was admitted without objection and the knives were admitted over defense objections. After the People rested, a defense motion for a directed finding was denied.

Delfinio Bustos, a Chicago police officer, testified that he acted as an interpreter in the meeting between Balcazar and defense counsel. The questions and some answers were in English and when Balcazar appeared not to understand, Bustos translated for him. Bustos said that when Balcazar was asked by defense counsel if he remembered what the offenders wore, Balcazar answered he did not know. There were no photographs present during this interview. On cross-examination, Bustos stated that when assistant State's attorneys asked Balcazar how his

attackers were dressed, he stated one in a brown "T" shirt and dark pants and the other in blue pants and red shirt. This was before the interview with defense attorneys and the lineup photographs were in a file jacket.

The defendants entered into a stipulation with the People that the beat officer's report would be received in evidence. They further stipulated that the report stated in part:

"* * * victim and witnesses described offenders as male Mexicans, 17 to 18, age, height, and weight, long hair, no further description."

Ayala, Mendoza's co-defendant, testified that on the night in question he was at the corner of 27th and Whipple Street with three friends whom he named. He was wearing gym shoes, jeans and a sweatshirt. The next day he was wearing a red body shirt, blue pants and beige shoes. That day, he went to Mendoza's house to get an umbrella he had left there and was arrested at around 3 p.m. He had not seen the wristwatch around the house before, although he had been there as often as twice a week. He also had not seen Mendoza on either May 30 or on May 31 before the police brought him back to the house.

Mendoza also testified in his behalf. In addition, his testimony from the hearing on the motion to quash the arrest and suppress evidence was incorporated at trial by stipulation. He and a friend, Banhagyi, shared the apartment at 2924 West 25th Place. No one else had keys to the apartment.

On May 31, 1975, he was stopped in his car in front of the apartment (while Banhagyi had title to the car, Mendoza had paid for half of the car)—the license plate was WE 5884. The officer, in plain clothes, showed Mendoza his badge and asked if the car had been stolen. Mendoza said it had been, but that it had been recovered a few days earlier. Mendoza was then arrested and advised of his rights. He told the police where he lived and that Banhagyi and maybe friends of his would be there. (According to police testimony at the pretrial hearing he said that he had been with his friends all night at his house and that they were still there. At trial Mendoza denied that he had ever told the officers that.) After calling for additional assistance, the officers went to the apartment, and went in. At no time did Mendoza see any police officer in the apartment with gun drawn. He was lined up with the others in the apartment, including Banhagyi, in the kitchen and searched. Other officers searched the apartment. Mendoza never consented to the search.

He never learned any details about the theft of the car. When the car was stolen, the keys were not in it. When defendant picked the car up, he noticed no damage to the car and he needed the keys in the ignition to drive it home. The car had not been stolen before. Defendant never let anyone else but Banhagyi, the co-owner, use it. On occasion, Banhagyi would let others use it though. Defendant did not know if the others using

the car had keys to it. He stated that on May 30, 1975, he did not drive the car.

As for the knives, the defendant had never seen one of them before. The other one was an electrician's knife belonging to defendant's brother. Mendoza, however, denied seeing his brother's knife on the day he was arrested. Mendoza further denied robbing or kicking Fidel Balcazar the evening of May 30, 1975, or seeing someone do these things to him. He testified that on May 30, 1975, he was at his house as he had been practically all day. On that day around 11:30, defendant was with Banhagyi and a few of Banhagyi's personal friends whose names defendant did not know. The friends did not spend the night although sometimes friends did. Ayala had never spent the night. Defendant did not believe Ayala was at his house twice a week that summer. Defendant then testified that he was approximately 69 inches tall and Ayala 2-2½ inches shorter than that.

## I.

The defendant contends that Balcazar's identification of Mendoza was thoroughly impeached by his inability to provide other than a general description of the assailant immediately following the robbery and the discrepancies between that general description and the actual appearance of Mendoza, namely the failure to mention his mustache and goatee and the description of the defendant's hair as "long." The defendant further contends that Balcazar's opportunity to observe his attacker was at best minimal.

■■ ■ In a bench trial, the determination of the credibility of the witnesses and the weight to be given their testimony are matters for the trial judge and the reviewing court will not substitute its judgment unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt. (*People v. Tillis* (1976), 40 Ill. App. 3d 66, 351 N.E.2d 332; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450.) While it is true that a conviction cannot stand if the identification testimony is vague, doubtful and uncertain, especially if the identification testimony reveals a failure to mention some physical feature (*People v. Glaze* (1977), 48 Ill. App. 3d 523, 362 N.E.2d 1287; *People v. Ross* (1976), 39 Ill. App. 3d 241, 349 N.E.2d 678), nevertheless, it is well established that where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *In re Winslow* (1977), 46 Ill. App. 3d 962, 361 N.E.2d 622; *People v.*

*Chatman* (1975), 32 Ill. App. 3d 506, 336 N.E.2d 153, *appeal denied* (1976), 63 Ill. 2d 552.) And while it is true that the failure to include a certain physical characteristic in the original description of the offender may affect the credibility of the description, the important factor is the ability of the witness to make a positive identification after having had an adequate opportunity to view the offender at the time of the crime. (*People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235.) Where the witness makes a positive identification, precise accuracy in the preliminary description is not necessary. (*People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *appeal denied* (1978), ___ Ill. 2d ___; *People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235; *People v. Marbley* (1975), 34 Ill. App. 3d 434, 340 N.E.2d 247; *People v. Hunt* (1975), 34 Ill. App. 3d 472, 340 N.E.2d 203, *appeal denied* (1975), 58 Ill. 2d 597.) After all, "[e]xperience tells us that an identification is not usually made by distinguishing separate features but by the total impression made upon the witness." (*People v. Smith* (1977), 52 Ill. App. 3d 583, 587, 367 N.E.2d 756, 759, *appeal denied* (1978), ___ Ill. 2d ___; also: *People v. Winston* (1975), 28 Ill. App. 3d 237, 328 N.E.2d 49, *appeal denied* (1975), 60 Ill. 2d 601.) As stated in *People v. Ervine* (1965), 64 Ill. App. 2d 82, 87-88, 212 N.E.2d 346, 349, *appeal denied* (1966), 33 Ill. 2d 625:

> "But it is contrary to human experience to make an identification by noticing first the separate features, hair, or clothes of a person, and then, somehow, running off a total to determine recognition or non-recognition. Ordinarily all features are viewed at once and the recognition made instantaneously or not at all. This is one of the reasons why minor discrepancies in identification do not require reversal. *People v. Boney*, 28 Ill. 2d 505, 509, 192 N.E.2d 920; *People v. Prochut*, 27 Ill. 2d 298, 300, 189 N.E.2d 290. The essentials were present in the victim's opportunity to observe, and her positive identification, the sufficiency of the recognition being a question of fact for the trial court. *People v. Reed*, 27 Ill. 2d 342, 343, 189 N.E.2d 253; *People v. Washington*, 26 Ill. 2d 207, 210, 186 N.E.2d 259."

Moreover, witnesses are not always able to articulate every detail of what they know. Accordingly, it has consistently been held that any discrepancies or inaccuracies or omissions as to facial hair (*People v. Catlett* (1971), 48 Ill. 2d 56, 268 N.E.2d 378; *People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *appeal denied* (1978), ___ Ill. 2d ___; *People v. Moore* (1977), 50 Ill. App. 3d 952, 365 N.E.2d 1356; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; *People v. Hoard* (1977), 49 Ill. App. 3d 1021, 364 N.E.2d 980; *People v. Marbley* (1975), 34 Ill. App. 3d 434, 340 N.E.2d 247; *People v. Rogers* (1975), 32 Ill. App. 3d 788, 336 N.E.2d 784, *appeal denied* (1975), 58 Ill. 2d 598; *People v. Winston* (1975),

28 Ill. App. 3d 237, 328 N.E.2d 49, *appeal denied* (1975), 60 Ill. 2d 601; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450), or some other facial characteristic (*People v. Miller* (1964), 30 Ill. 2d 110, 195 N.E.2d 694 (scar); *People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340 (witness said had pock marks under eyes which accused did not, also said wore wire-rimmed glasses which he did not); *People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235 (missing teeth); *People v. Sanford* (1975), 34 Ill. App. 3d 485, 340 N.E.2d 255, *appeal denied* (1976), 63 Ill. 2d 554 (missing tooth); *People v. Hunt* (1975), 34 Ill. App. 3d 472, 340 N.E.2d 203 (scar), or some other physical characteristic such as height or weight (*People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *appeal denied* (1978), ___ Ill. 2d ___; *People v. Moore* (1977), 50 Ill. App. 3d 952, 365 N.E.2d 1356; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; *People v. Chatman* (1975), 32 Ill. App. 3d 506, 336 N.E.2d 153, *appeal denied* (1976), 63 Ill. 2d 552; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450), or age (*People v. Hoard* (1977), 49 Ill. App. 3d 1021, 364 N.E.2d 980; *People v. Fletcher* (1977), 46 Ill. App. 3d 530, 361 N.E.2d 97; *People v. Chatman* (1975), 32 Ill. App. 3d 506, 336 N.E.2d 153, *appeal denied* (1976), 63 Ill. 2d 552), or tatoos (*People v. Crotty* (1976), 44 Ill. App. 3d 413, 357 N.E.2d 1360; *People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235), are not fatal (*People v. Chatman* (1975), 32 Ill. App. 3d 506, 336 N.E.2d 153, *appeal denied* (1976), 63 Ill. 2d 552; *People v. Marbley* (1975), 34 Ill. App. 3d 434, 340 N.E.2d 247; *People v. Rogers* (1975), 32 Ill. App. 3d 788, 336 N.E.2d 784, *appeal denied* (1975), 58 Ill. 2d 598), but simply go to the weight of the identification testimony and are to be evaluated by the trier of fact. (*People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; *People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235; *People v. Hunt* (1975), 34 Ill. App. 3d 472, 340 N.E.2d 203; *People v. Winston* (1975), 28 Ill. App. 3d 237, 328 N.E.2d 49, *appeal denied* (1975), 60 Ill. 2d 601.) This is particularly true where the witness, as here, picked the accused out of a lineup. *People v. Fletcher* (1977), 46 Ill. App. 3d 530, 361 N.E.2d 97; *People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *appeal denied* (1978), ___ Ill. 2d ___; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907.

The defendant relies on *People v. Kincy* (1966), 72 Ill. App. 2d 419, 219 N.E.2d 662; *People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133 and *People v. Martin* (1968), 95 Ill. App. 2d 457, 238 N.E.2d 205, all decided by the same panel. The judges in all three cases, considering that a mustache is something that would not normally be overlooked, reversed the defendant's conviction. In *Kincy* the identifying witness identified the accused by the color of his jacket, about which she was not positive; in *Martin* the lighting conditions (the interior of a taxicab at night) were, as the court pointed out, poor at the time of the robbery. We agree,

however, with the defendant that *People v. Marshall* is similar to the present case. In that case, the robbery victim described his assailant as colored with a black mustache, about 20 years old and 5 feet 10 or 11 inches tall, the victim's height. He said he was not sure about the mustache because he didn't "look that close." In fact, the defendant was only 5 feet 6 inches tall and had no mustache. The court held that the description completely outweighed the fact that he picked out the defendant's picture 6 days after the robbery and identified him in a lineup 5 weeks later. Nevertheless, we are not persuaded by the reasoning of the court in *Marshall*, or the other two cases, particularly in light of the long line of cases, previously cited, which have held such discrepancies merely to go to the question of the weight of the evidence. For example, in *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450, decided by this court, the witness described the burglar as a 5 foot 8 or 9 inches tall Negro who weighed 170-180 pounds; he did not mention any mustache to the police. In fact the defendant weighed 200 pounds and was 6 feet 2½ inches tall. He had a mustache. This court held that none of these discrepancies, although practically identical to those in *Marshall*, destroyed the credibility of the identification. Likewise in *People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *appeal denied* (1978), ___ Ill. 2d ___; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907 and *People v. Moore* (1977), 50 Ill. App. 3d 952, 365 N.E.2d 1356, there were, as in *Marshall*, discrepancies both as to size and as to facial hair. Yet the courts did not find such discrepancies fatal.

■■ ■ We are persuaded that the victim did have a reasonable opportunity to see the three assailants who were in front of him. Balcazar testified that the whole robbery lasted several minutes. The two behind even held him up while the three in front hit him. While it was night, there were street lights 25 to 30 feet apart along the street. The first light was about 20 feet away from where he was robbed. In *People v. Green* (1976), 42 Ill. App. 3d 978, 356 N.E.2d 947 it was held that a 30-second face to face confrontation on a well-illuminated street at 3 a.m. was sufficient for a positive identification. We agree.

Furthermore, it must be remembered that Mendoza was part owner of and the next day was driving the automobile which fit the description, including license number, given by Luevano. (Compare *People v. Turner* (1974), 19 Ill. App. 3d 697, 312 N.E.2d 421.) It is true that Balcazar did not testify that the robbers were driving the black-over-red Pontiac. It is also true that Luevano did not witness the actual robbery. But he was out in front of his house in time to see Balcazar return after retrieving his wallet. And at that time there were only two cars on the street, the black and red Pontiac, which was going west, and an eastbound car. This latter could not have been the robbers' car since Balcazar testified that the robbers

had run east after they had robbed him; so their car would not have been west of Luevano. Accordingly, we conclude that the trial court's determination is supported by the evidence.

## II.

The defendant, however, contends that the conviction must be reversed because some of the evidence was improperly admitted.

■■ The defendant's first contention is that the trial court erred in allowing the admission of two knives in evidence although there was insufficient evidence to connect them either to the crime charged or to the defendant. We need not decide that question since it is clear that even if there was error, it was not prejudicial since the defendant was not found guilty of armed robbery. *People v. Trotter* (1975), 27 Ill. App. 3d 136, 326 N.E.2d 524, *appeal denied* (1975), 60 Ill. 2d 600, cited by the defendant is not in point. In that case, the appellate court held that the normal presumption that in a bench trial the court has considered only proper and competent evidence could not be applied because it was inconsistent with the trial judge's ruling that the evidence would be received for a limited purpose. In the present case, the trial court merely overruled the defendant's general objection to the admission of the knives themselves into evidence, after the discovery of the knives and the knives themselves had been described at length without any objections being made. It is difficult to see how the admission of the knives themselves into evidence could have any greater effect on an experienced trial judge than the testimony which at no time, either below or on appeal, has been objected to. Furthermore, when the trial judge sentenced the defendants he pointed out that he had found them guilty of the lesser included offense of robbery because he was not satisfied beyond a reasonable doubt of the existence of the knives. Thus it is clear that the trial judge did in fact reject this evidence.

## III.

Because the trial court denied the defendant's motion to suppress, the State was able to introduce at trial the two knives and the watch which were seized in the apartment. We have determined that admission of the knives was not prejudicial even if erroneous. But it is undisputed that if the watch was erroneously admitted into evidence, that admission constituted prejudicial error. It was found in the defendant's apartment and was identified by the victim as having been taken from him in the robbery. We therefore must consider defendant's contention that this evidence should have been suppressed.

The trial court, at the hearing on the motion to suppress certain evidence found:

"On May 31, 1975 here in Cook County, Officer Louis Lara, L a r a, received a police report from certain beat officers in connection with an alleged robbery that had taken place earlier. The police report that he received indicated that the victim had been robbed at knifepoint by male Mexicans, 17-19 years of age, average height and weight, long hair, and that they had taken currency from him.

After receiving this report Officer Lara went to the home of the victim and interviewed the victim and received information that there were five offenders, that a watch had been taken, the police report indicated and the victim indicated, that the offenders were in an automobile described as a 1967 black over red 2-door Pontiac with license number WE 5884.

Officer Lara checked that license number to determine ownership and received information that the license was issued to Roberto Banhagyi, address 2924 West 25th Place.

Officer Lara proceeded to that address, and as he approached the address he observed a car bearing that license number fitting the description that he had received driving up the street.

He stopped the car, and it was being driven by the defendant Mendoza. Defendant Mendoza appears to the Court to be of Mexican extraction, young man. Officer Lara asked him for his drivers license. Mr. Mendoza did not have his drivers license with him, left it at home.

Officer Lara informed him that the car that he was driving was purportedly involved in an armed robbery that had taken place the day before or earlier that night. Mr. Mendoza informed him that he had been at home with friends during the time the armed robbery took place, that the friends were still at his home, which was at that address the officer received for the owner of the car a short distance away.

Officer Lara took the defendant Mendoza into custody. Court finds that he had probable cause to do so. Officer Lara summoned additional assistance to go to the house where these friends were supposed to be. If those friends would have substantiated Mr. Mendoza's information given to the officer, then of course the

officer could release Mr. Mendoza and proceed to look for other people who might be involved in this offense.

Time is of the essence, of course. He went to that address, was directed by Mr. Mendoza to the door of the apartment where he lived, knocked on the door, identified himself, announced his office, entered the apartment, and in the apartment there were other persons including the defendant Ayala, also apparently extraction [sic], when I say apparently, it appears to the Court that he may be, that he is also a young man, Latin extraction:

Court finds that as a matter of law police had probable cause to arrest the defendant Ayala.

Accordingly, the Motion to Quash Arrest and Motion to Suppress evidence which was incorporated in the motion to quash arrest as to both defendants will be denied."

■■ Mendoza does not contend that the trial court's findings of fact were not supported by the evidence. Nor does he contend that the police did not have probable cause to arrest him; and it is clear probable cause did in fact exist. Mendoza fitted the general physical description given by the victim and not only was driving but admitted to the officer to being part owner of the vehicle which the police were told the robbers had used. (*People v. Turner* (1975), 32 Ill. App. 3d 221, 336 N.E.2d 49.) But as the State conceded, Mendoza's arrest, while proper, does not justify the search of his apartment, some distance away. *James v. Louisiana* (1965), 382 U.S. 36, 15 L. Ed. 3d 30, 86 S. Ct. 151.

The State, however, contends that under three exceptions to the warrant requirement, this warrantless search and seizure was justified: (1) there was consent to the search; (2) the seizure was made pursuant to a search incident to the arrest of Ayala; (3) the seizure was of items in plain view.

The State first contends that the trial court's ruling should be affirmed because Roberto Banhagyi, who resided with Mendoza at 2924 West 25th Place, consented to the search when the police officers knocked on the door. There was testimony that Banhagyi consented to the search. There was also testimony tending to contradict this. We cannot fairly say that the denial of the motion to suppress constituted a finding by the trial court that he considered the State's proof on this issue to be more persuasive or credible, for the judge based his denial solely on the grounds that Ayala's arrest was proper and therefore the search was justified. Since a determination of this question involves assessing the credibility

of the witnesses, we believe the cause should be remanded for a new hearing on the question of consent (see *People v. Tate* (1967), 38 Ill. 2d 184, 230 N.E.2d 697), if the seizure is not justified on either of the other two State theories.

■■ The State's second contention is that the seizure was justified because it was made pursuant to a search incident to Ayala's arrest in the apartment. But such a search is only lawful if it is part of a valid arrest (*Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034); a search incident to an arrest is invalid if there was no probable cause for the arrest. (*Beck v. Ohio* (1964), 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223; *People v. Kalpak* (1957), 10 Ill. 2d 411, 140 N.E.2d 726; *People v. Johnson* (1973), 14 Ill. App. 3d 254, 302 N.E.2d 430.) From Officer Lara's testimony it appears that the only information he had when he arrested Ayala was that Balcazar was robbed by five male Mexicans, ages 17-19, average weight and long hair, who had been riding in a 1967 black over red 2-door Pontiac with license number WE 5884; that that automobile was owned by a person residing at 2924 West 25th Place; that at the time Officer Lara knocked on the door Ayala, while not a resident of the premises, was present, and that Mendoza claimed that he and Ayala had been together all the previous night at that address. This without more simply was not enough to justify the arrest. It is well accepted in Illinois law that a general description is insufficient to provide the probable cause necessary to justify an arrest unless supported by other relevant facts and circumstances known to the arresting officer. (*In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606, *appeal denied* (1974), 56 Ill. 2d 591.) Likewise, probable cause to arrest one person does not constitute, in itself, probable cause to arrest and search everyone else present or associating with the first person. (*People v. Galloway* (1956), 7 Ill. 2d 527, 131 N.E.2d 474; *People v. Spriggs* (1976), 38 Ill. App. 3d 737, 348 N.E.2d 468.) Guilt by association is a thoroughly discredited doctrine. (*People v. Ramirez* (1968), 93 Ill. App. 2d 404, 236 N.E.2d 284; *Uphaus v. Wyman* (1959), 360 U.S. 72, 3 L. Ed. 2d 1090, 79 S. Ct. 1040.) Nor was Mendoza's claim here that Ayala could alibi for Mendoza a sufficient additional circumstance so as to permit Ayala's arrest.

Because the warrantless arrest of Ayala was not justified, the search of the premises cannot be justified as a search incident to his arrest.

■■ Finally, the State contends that the items were properly seized because they were in plain view. But such evidence may be seized only when it is in the "plain view" of officers who are observing from a place where they have a right to be. (*Harris v. United States* (1968), 390 U.S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992; *People v. Holt* (1974), 18 Ill. App. 3d 10, 309 N.E.2d 376.) Here the officers viewed the items only after they were inside the apartment. Therefore a prerequisite for applicability of

the plain view exception to the warrant requirement in this case is a finding of a legal entry into the apartment by the police. Consent could provide justification for the entry, but we have already determined a hearing on that question by the trial court would be necessary before a finding could be based on it. A second possible justification would be entry to make an arrest upon probable cause, although case law on this point is unsettled. (Compare *People v. Johnson* (1970), 45 Ill. 2d 283, 259 N.E.2d 57, *cert. denied* (1972), 407 U.S. 914, 32 L. Ed. 2d 689, 92 S. Ct. 2445, with *People v. Wolgemuth* (1977), 69 Ill. 2d 154, 370 N.E.2d 1067, and cases cited therein.) But we need not reach the issue of the validity of such an entry, because we have already determined that the police had no probable cause to arrest Ayala. On the record before us the seizure cannot be justified by the plain view exception.

Because these final two State theories have not been found to justify the seizure the cause must be remanded to the trial court for a new hearing on the question of consent. If no consent is found, then the evidence in question must be suppressed and the defendant either discharged or retried on the charge of robbery, as the State should elect. If it is determined that the search was consented to, or that consent to enter was given and the items were then in plain view, a new judgment of conviction shall be entered.

Reversed and remanded with direction.

JOHNSON, P. J., and DIERINGER, J., concur.