THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AUGUSTINE ZAMBRANO, Defendant-Appellant.

First District (2nd Division)   No. 1—88—0275

Opinion filed August 29, 1989.—Rehearing denied October 11, 1989.

Abbey G. Fishman, of William A. Swano & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Joseph G. Howard, and Scott Lane, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Following a bench trial, defendant Augustine Zambrano was convicted of attempted murder, aggravated battery, and unlawful use of a firearm. He was sentenced to 20 years in the Illinois Department of Corrections.

On this appeal, defendant claims that (1) the trial court's finding of guilt was erroneously based on unreliable identification testimony; (2) the trial court erred in denying his motion to reopen his case in chief to allow a witness to testify; and (3) the trial court improperly shifted the burden of proof by basing its guilty finding on his failure to prove that another person shot the victim.

At trial, John Scott, the victim in this case, testified that on December 21, 1986, he was "working the front door" at the Fire Alarm Lounge in Cicero, Illinois. Scott worked in a well-lit vestibule with two sets of doors. Patrons entered the vestibule through outer doors approximately 15 feet from where Scott sat. Scott checked patrons for valid identification from where he sat inside the vestibule. There was a large, well-lit canopy outside the vestibule.

According to Scott, at approximately 5:30 a.m. on December 21, 1986, defendant and three other men entered the vestibule at the Fire Alarm Lounge. All four men were of Latino or Hispanic origin. Defendant was the first man who came in and was wearing gold chains and a long, gray coat. The second man who came in was wearing a long, black coat, but Scott could not remember what the other two men were wearing. Scott testified that the first man who came in was approximately 5 feet 9 inches tall, had medium length hair, a mustache, and "a little hair down his chin."

Scott testified that defendant approached him and produced a valid Illinois driver's license with a photograph. One of the other three men produced an invalid identification and the other two did not have any identification. Scott spoke to defendant from a distance of about two feet and told defendant that his friends could not come in

because they did not have proper identification. All four men then sat off to the side in a waiting area. Approximately five to eight minutes later, defendant walked up to Scott and asked whether he could let his friends in. Scott told defendant that he could come in, but his friends could not. During this conversation, Scott stood approximately two to three feet from defendant and could clearly see his face and features.

At that point, according to Scott, "comments were being said" and Scott approached the men and told them they would have to leave. All four men then left the vestibule and stood outside under the canopy. The two men without any identification were the first to leave the vestibule and defendant was the last to leave. All four men stood outside under the canopy at a distance of four feet, while Scott stood in the doorway looking directly at them. According to Scott, defendant was the third man from his right. Scott told the men to go home, turned to go inside, and then, "out of the corner of [his] eye,[,]" saw the third man from his right run towards him holding a gun in his hand. That man shot Scott in the stomach and all four men then fled.

Five days after the shooting, while in the hospital receiving medical treatment for his gunshot wound, Scott identified defendant as the man who shot him from a photographic lineup. At defendant's trial, Scott testified that there was "no doubt in [his] mind" that defendant shot him.

Walter Dzendzeluk testified that at approximately 5:30 a.m. on December 21, 1986, he was in the vestibule at the Fire Alarm Lounge. Dzendzeluk had been to two other taverns that night, and between 10 p.m. and 5:30 a.m., had consumed approximately 12 beers. Dzendzeluk saw Scott standing in the doorway speaking to defendant. According to Dzendzeluk, defendant was standing just outside the doorway at that time and was wearing a long, gray coat. Dzendzeluk, who is 6 feet tall, walked up behind Scott, who is 6 feet 5 inches tall, looked over his shoulder and saw defendant's face clearly from a distance of approximately four feet. Dzendzeluk stood directly behind Scott one foot from the door for at most 60 seconds. Dzendzeluk "heard a shot" that came "[f]rom the gentleman standing, facing the doorway." According to Dzendzeluk, the man who shot Scott fled after the shooting.

Dzendzeluk identified defendant as the shooter at a police lineup that morning. At defendant's trial, Dzendzeluk identified defendant in court as the man who was standing outside the doorway facing him and also as the man who shot Scott.

Alex Torrez, a friend of defendant's, testified on defendant's be-

half. Torrez testified that he went to the Fire Alarm Lounge at approximately 5:30 a.m. on December 21, 1986, carrying a .22 caliber gun. Torrez showed his identification card to Scott, but Scott told him he could not enter and called him a "spick." Torrez claimed that Scott pushed him down onto the sidewalk, reached for something that Torrez thought was a gun or a knife, and then "came at him." Torrez "got scared," pulled out his gun, shot Scott from a distance of about eight feet, and then ran away. According to Torrez, at the time of the shooting, defendant was talking to someone off to the side to the left of the doors.

At the time of defendant's trial, Torrez was 20 years old and had two criminal charges pending against him. Torrez admitted that he never spoke with police about the incident at the Fire Alarm Lounge, but discussed his testimony with defendant's lawyer and Gregory Gunter, another defense witness. According to Torrez, on the same day as the shooting he had defendant's lawyer transcribe a statement in which he admitted shooting Scott.

Erin Johnson testified that, on December 21, 1986, after she finished her 8½-hour shift as a waitress in a restaurant, she drove to the Fire Alarm Lounge with two men. One of those men was Brian Freeze, whose testimony was the subject of defendant's motion to reopen his case in chief. That motion is discussed below.

Johnson testified that she arrived at the Fire Alarm Lounge between 4:30 and 5 a.m. and, from a point about eight feet from the door and off to the side, saw an argument between three men, including defendant and Scott. Johnson saw Torrez lift up his coat and then heard a "pop." At the time she heard the "pop," Torrez had one hand in his pocket. According to Johnson, defendant was wearing a long, black coat at that time and did not have a gun in his hand. After hearing the "pop," Johnson saw Torrez turn and run away, and then saw a "glare" that "appeared to be" a gun. On cross-examination, Johnson admitted that she was not "exactly" sure that she saw a gun.

Johnson testified that she spoke with defendant's investigator 10 days after the shooting. The investigator showed Johnson several photographs of the Fire Alarm Lounge and one photograph of Alex Torrez. Johnson admitted that she was never shown a photograph of defendant and never viewed a lineup.

David Morrison, another defense witness, testified that he arrived at the Fire Alarm Lounge between 4 and 4:30 a.m. on December 21, 1986. Morrison had been working as a bouncer at another tavern from 9 p.m. until 4 a.m. After arriving at the Fire Alarm Lounge,

Morrison drank three or four beers and then entered the vestibule to buy cigarettes. There was a commotion at the door, approximately 10 to 15 feet from the cigarette machine where Morrison was standing. Morrison claimed he could see out the front door, even though Scott was standing in the doorway.

Morrison testified that he heard a shot and saw defendant outside the doorway with his hands down by his side and wearing a black coat. Morrison did not see a gun in defendant's hands. Morrison admitted on cross-examination that he did not see the shooting and did not know who shot Scott.

Finally, Gregory Gunter testified that on December 21, 1986, he was at the Fire Alarm Lounge and drank six beers between midnight and 5 a.m. Gunter claimed he spoke with defendant that night outside the Fire Alarm Lounge, while defendant's friends, including Torrez, were arguing with Scott. While Gunter was talking to defendant, he heard a shot and then saw people running away. According to Gunter, defendant was wearing a long, black coat at the time of the shooting and did not have a gun. Gunter was a friend of defendant's and has been convicted of auto theft and robbery.

Defendant was found guilty by the trial court and judgment was entered on October 27, 1987. On November 24, 1987, defendant moved to reopen his case in chief for the purpose of allowing Brian Freeze to testify on defendant's behalf. Brian Freeze was one of the men who was with Erin Johnson on the night of the shooting. Defendant's lawyer filed an affidavit stating that he was first able to contact Brian Freeze on November 17, 1987. Defendant's lawyer stated that he was given Freeze's telephone number in California after visiting Freeze's mother in Burbank, Illinois. The affidavit indicates that defendant's lawyer first learned that Brian Freeze was a potential witness when his name was mentioned during the course of Erin Johnson's testimony at trial. However, the record reflects that defendant's lawyer knew Brian Freeze's name prior to trial.

On December 8, 1987, after reviewing the trial transcript, the trial court denied defendant's motion. The court noted that defendant knew Brian Freeze's name before trial, that the case had been "continued two or three times for testimony," but that defendant did not ask for a continuance when Erin Johnson testified at trial that she was with Freeze. The court also denied defendant's request to make an offer of proof, stating that "[y]ou cannot make a record or offer of proof of what would be testified to at trial when he [Freeze] was denied the right to testify because of the lack of due diligence on the part of the defense." The court then noted that defendant "told the

court what [Freeze would] testify to." Defendant's lawyer had, in fact, stated that Freeze was prepared to testify that Torrez was the shooter and "knew certain facts about the shooting incident" that would corroborate Torrez' testimony.

On December 4, 1987, defendant's lawyer took Freeze's deposition. At his deposition, Freeze stated that he was "absolutely" sure defendant was not the shooter. Defendant then filed a supplemental motion for a new trial which included as grounds for error the trial court's refusal to allow Freeze to testify on defendant's behalf. On January 19, 1988, defendant's supplemental motion for a new trial was denied. The court specifically refused to grant a new trial based on Freeze's deposition testimony. The court noted that the deposition testimony was "cumulative, almost verbatim with Mr. Torrez' alleged confession." The trial judge also stated that he had looked in the telephone book and found the telephone number of Brian Freeze's father. The trial court then heard arguments in aggravation and mitigation and sentenced defendant to 20 years in the Illinois Department of Corrections.

I

Defendant maintains that the trial court's finding of guilty was erroneously based on unreliable identification testimony. Specifically, defendant contends that Scott's testimony was unreliable because his initial description of his assailant was vague, considering Scott's proximity to his assailant, and also inconsistent with his testimony at trial. Defendant maintains further that Dzendzeluk's testimony was unreliable because Dzendzeluk was intoxicated and his vision was obstructed. Defendant claims that Dzendzeluk had had 14 beers before the shooting and admitted at trial that he was intoxicated. Defendant also claims that Dzendzeluk did not testify that he saw the shooting and admitted that his view was obstructed by Scott, who was standing between him and the shooter.

In a bench trial it is the function of the trial judge to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. (*People v. Berland* (1978), 74 Ill. 2d 286, 305-06, 385 N.E.2d 649; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 1318.) Moreover, the reviewing court will not set aside the trial court's judgment unless the proof is so unsatisfactory, improbable, or implausible as to justify a reasonable doubt as to the defendant's guilt. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 1318.)

Finally, "where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made." *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 1318; see also *People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317 ("[a] single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification").

■ Illinois courts have generally followed the Supreme Court's decision in *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375, and considered five factors in assessing identification testimony. They are: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *People v. Slim* (1989), 127 Ill. 2d 302, 308, 537 N.E.2d 317; *People v. Dean* (1987), 156 Ill. App. 3d 344, 351, 509 N.E.2d 618.

In this case, only the second, third, and fifth factors are at issue. Specifically, defendant does not argue that Scott lacked sufficient opportunity to view his assailant, except for noting that at the time of the actual shooting, Scott saw the shooter only "out of the corner of [his] eye." Indeed, defendant argues that Scott's testimony was unreliable because of discrepancies in Scott's initial description, despite the proximity between Scott and his assailant. Defendant also does not raise any issue with respect to the level of certainty in either Scott's lineup or in-court identification. Instead, defendant argues that Scott's testimony was unreliable because Scott lacked sufficient attention due to anxiety, fear, or excitement, because Scott's initial description of defendant was inaccurate, and because five days had elapsed between the shooting and Scott's lineup identification.

■ Each of defendant's contentions, however, necessarily fails. First, there was no evidence adduced at trial that Scott was anxious, afraid, or excited when defendant was standing either in the vestibule at the Fire Alarm Lounge, or outside underneath the canopy. Scott testified only that he was "scared" after he was shot. Thus, Scott's degree of attention plainly weighs in favor of upholding a finding that his identification testimony was reliable.

Second, with respect to the accuracy of Scott's initial description

of his assailant, defendant's reliance on this court's decision in *People v. Slim* (1987), 164 Ill. App. 3d 519, 518 N.E.2d 154, is misplaced. That decision was reversed by the Illinois Supreme Court in *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317. In that case, the robbery victim initially described his assailant as 5 feet 3 inches tall and 135 pounds, but stated at trial that he did not notice anything unusual about his assailant's teeth or mouth, even though the robber stood facing him at a distance of one or two feet. The defendant presented evidence at trial that at the time of the robbery he was 5 feet 9 inches tall, 165 pounds, wore braces and had unusually thick lips. Moreover, the defendant's father gave alibi evidence, stating that the defendant was home asleep at the time of the robbery. However, the victim positively identified the defendant at a lineup conducted 11 days after the robbery and also identified the defendant in court.

The defendant in *Slim* was convicted following a bench trial and the appellate court reversed. The appellate court stated that the victim's identification testimony was unreliable because of discrepancies between the defendant's appearance and the victim's initial description of his assailant's body size; because of the victim's failure to describe other features such as his assailant's hair, clothes, or the presence of braces or unusually thick lips; and, finally, because the defendant had given an unimpeached alibi.

However, the Illinois Supreme Court reversed, holding that the discrepancies in body size and the victim's failure to note unusual facial features did not, by themselves, create a reasonable doubt as to the defendant's guilt. The court stated that "[t]he presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made"; that such discrepancies or omissions "simply affect the weight to be given the identification testimony"; and that "a witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." (*People v. Slim* (1989), 127 Ill. 2d 302, 308-09, 537 N.E.2d 317.) The court also noted that the weight to be given to the defendant's alibi evidence was a question of credibility for the trier of fact.

■ In this case, Scott initially described the shooter as a male Latino, approximately 5 feet 7 inches to 5 feet 10 inches tall, with a mustache and wearing a dark-colored coat. Scott was only a few feet away from his assailant, yet failed to give a more specific description. In addition, Scott testified at trial, contrary to his initial description, that defendant was wearing a gray coat and that one of the men ac-

companying defendant was wearing a black coat. However, the discrepancies and omissions in Scott's description of his assailant were plainly not as great as the discrepancies and omissions in *Slim*. Moreover, like the witness in *Slim*, Scott positively identified defendant at a lineup and again in court. Thus, under the Illinois Supreme Court's decision in *Slim*, Scott's general description of the shooter and the discrepancy in his testimony with respect to the color of defendant's coat plainly did not, by themselves, raise a reasonable doubt as to defendant's guilt.

■ Defendant's argument that Scott's lineup identification of defendant was unreliable also fails under the Illinois Supreme Court's decision in *Slim*. In *Slim*, 11 days had elapsed before the victim identified the defendant at a lineup. The court did not find that interval significant, "[c]onsidering the nature of the event and other circumstances." (*People v. Slim* (1989), 127 Ill. 2d 302, 313, 537 N.E.2d 317.) In this case, although Scott was in the hospital receiving treatment for a gunshot wound at the time the photographic lineup was conducted, he did not testify at trial, contrary to defendant's assertion, that he ever "lost consciousness." Moreover, Scott testified at trial that he was "absolutely" sure defendant was the shooter. And Scott's identification testimony was corroborated by the testimony of Walter Dzendzeluk, who stated that he "clearly saw" defendant in the doorway talking to Scott at the time of the shooting. In short, Scott's condition at the hospital, or the delay in conducting the lineup, are not sufficient grounds for setting aside the trial court's judgment.

Since Scott's identification testimony alone was sufficient to sustain defendant's conviction, it is not necessary to consider the reliability of Dzendzeluk's testimony. In any event, we note that Dzendzeluk was looking over Scott's shoulder and testified that he could clearly see defendant's face. We also note that Dzendzeluk positively identified defendant at a lineup conducted on the same morning as the shooting.

■ Finally, in crediting Scott's testimony, the trial court necessarily discredited the testimony of each defense witness who stated that defendant was not the shooter. The trial court noted that defendant's most credible witness, Erin Johnson, was not sure if she saw a gun. The record also reflects that David Morrison never saw the shooting and that Gregory Gunter's testimony contradicted Johnson's testimony. Gunter was also a friend of defendant's and a convicted felon. Alex Torrez' testimony was discredited primarily because he was the only witness who testified that he was physically assaulted by Scott. The trial court also saw Torrez flash a gang signal at defendant and

even suggested that Torrez should have been investigated for perjury. Accordingly, the trial court reasonably concluded that the testimony of the defense witnesses was not credible and that defendant was proven guilty beyond a reasonable doubt based on the testimony of the State's witnesses.

## II

Defendant maintains next that the trial court erred in denying his motion to reopen his case in chief to allow Brian Freeze to testify. Specifically, defendant argues that the four-part test set forth in *People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398, applicable to motions for a new trial based on newly discovered evidence, applies as well to motions to reopen a case. Thus, defendant asserts that a motion to reopen a case should be granted if (1) the evidence was recently discovered since the trial; (2) the evidence was not discoverable before the trial by the exercise of due diligence; (3) the evidence is not cumulative in nature; and (4) the evidence is of such a conclusive nature that it would likely change the result in the trial. Defendant maintains that the proffered testimony of Brian Freeze satisfied this four-part test and, accordingly, should have been allowed. Defendant maintains further that he was denied due process of law when the trial court denied his motion to reopen the case after conducting "its own private investigation" to determine Freeze's whereabouts. Finally, defendant argues that the trial court erred in precluding him from making a formal offer of proof regarding the substance of Freeze's proffered testimony.

■ However, we hold that defendant's motion to reopen his case in chief was properly denied. The decision to grant a defendant's motion to reopen his case for further testimony is within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of that discretion. (*People v. Shore* (1984), 129 Ill. App. 3d 443, 472 N.E.2d 512.) In *People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288, the Illinois Supreme Court stated that motions for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts. The court stated further: "[I]n order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequences of an adverse verdict, such [motion] should always be subjected to the closest scrutiny by the court ***." Finally, the court stated that "the burden is upon the [movant] to rebut the presumption that the verdict is correct and to show there had been no lack of diligence." (*Reese*, 54 Ill. 2d at 59.) In *People v. Shore* (1984), 129 Ill.

App. 3d 443, 462, 472 N.E.2d 512, the court explained that the same principles are applicable to a defendant's post-trial motion to reopen his case.

■ In this case, the record reflects that defendant did not exercise due diligence in contacting Freeze and that Freeze's proffered testimony was not credible and would not have changed the outcome of the trial. Specifically, the record reflects that defendant knew Freeze's name prior to trial and knew that Freeze lived in California, yet never requested a continuance for the purpose of contacting Freeze. It was not until after judgment of guilt was entered that defendant made the effort to contact Freeze's mother and learn Freeze's telephone number in California. Indeed, the record reflects that defense counsel was surprised by the outcome of this case and, accordingly, did not expect that it would be necessary to call Freeze as a witness at trial.

Moreover, defense counsel's affidavit, attached to defendant's motion to reopen his case, asserts that defense counsel first learned Freeze's name during the course of Erin Johnson's testimony at trial. However, on this appeal, defendant admits that Freeze was known to be a potential witness at discovery before trial. Maintaining such contrary positions appears to be the type of "fraud and imposition which defeated parties may be tempted to practice" alluded to by the Illinois Supreme Court in *Reese. (People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288.) Accordingly, we do not find it necessary to decide whether the four-part test set forth in *Molstad* applies to motions to reopen a case, because we find that defendant failed to show no lack of diligence in contacting Freeze. Under *Reese* and *Shore*, it follows that the trial court did not abuse its discretion in denying defendant's motion.

■ Defendant's argument, that he was denied due process because the trial court's decision to deny his motion was based on a "private investigation" is likewise without merit. The record reflects that the trial court denied defendant's motion to reopen his case because of defense counsel's lack of due diligence and because Freeze's deposition was taken after trial and was "almost verbatim with Mr. Torrez' alleged confession." The trial court indicated that he considered the "totality of circumstances" and only noted that it would have been easy for defense counsel to look up Freeze's name in the telephone book.

■ With respect to the trial court's refusal to allow defendant to make an offer of proof, the record reflects that the trial court was apprised of the substance of Freeze's testimony at defendant's motion

to reopen his case and again at defendant's motion for a new trial. When defendant first presented his motion to reopen the case, he indicated that Freeze was prepared to identify Alex Torrez as the shooter. Freeze's deposition testimony was then made part of the record and the trial court considered that testimony in ruling on defendant's motion for a new trial. On this appeal, defendant indicates only that he "would have provided a detailed account that Mr. Freeze witnessed the argument between Alex Torrez and John Scott." Significantly, defendant has not offered any such "detailed account" on this appeal except for what is already reflected in the record. Accordingly, there is no merit to defendant's argument that any error resulted from the trial court's refusal to allow an offer of proof.

### III

Defendant contends that the trial court improperly shifted the burden of proof by basing its guilty finding on defendant's failure to prove that Alex Torrez was the shooter. In support of his argument, defendant notes that the trial court discredited the testimony of Erin Johnson because she was uncertain whether she saw Torrez with a gun; discredited Gregory Gunter's testimony because it was inconsistent with the testimony of other witnesses; and failed to consider David Morrison's testimony. Defendant also argues that the trial court lessened the State's burden by discrediting Torrez' testimony, despite the lack of any evidence that Torrez would lie.

However, we are not persuaded by defendant's argument. The record reflects that the trial court based its guilty finding on the testimony of the State's witnesses. There is no indication in the record that the trial court based its guilty finding on defendant's failure to prove that Torrez was the shooter. Rather, the trial court simply discredited the testimony of the defense witnesses. In particular, the trial court found that Johnson's testimony was not credible because she was not sure she saw a gun and, therefore, was not sure who shot Scott. The trial court likewise discredited Gunter's testimony because he not only was a convicted felon, but also gave a version of the events that was inconsistent with the testimony of the other witnesses at trial. Although the trial court did not comment on Morrison's testimony, the trial court did note that the only witnesses who testified that they saw the shooting were the State's witnesses and Alex Torrez. Because Morrison did not see the shooting, the trial court properly discredited his testimony.

Finally, the trial court did not lessen the State's burden by discrediting Torrez' testimony. On the contrary, the trial court's remark,

that Alex Torrez should be investigated for perjury, indicates that the trial court simply did not find Torrez to be a credible witness. Indeed, Torrez was the only witness who testified that Scott "came at him" and threw him to the ground, and the record reflects that the trial court saw Torrez flash a gang sign to defendant when he was leaving the witness stand.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BILANDIC, P.J., and SCARIANO, J., concur.