THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES A. HENDERSON, Defendant-Appellant.

(No. 54836; ▮▮▮▮▮▮)

First District—June 9, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Herbert Becker, Ronald P. Katz, and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Henry Hauser, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, James A. Henderson, was charged with the offense of armed robbery in an indictment returned on May 27, 1969. After a bench trial, he was found guilty and sentenced to serve 2 to 3 years in the Illinois State Penitentiary.

He contends on appeal (1) that he was not identified as the robber beyond a reasonable doubt; (2) that the pretrial identification procedure through the use of photographs was so prejudicial as to taint his conviction; (3) that the identification was so vague and uncertain that his alibi testimony should not have been disregarded; and (4) that he was deprived of due process of law when the trial judge refused a request to issue warrants for the arrest of three witnesses.

Due to the nature of the contentions raised, it is necessary to set forth the evidence presented at trial. Ray Mansker, an attendant at a gas station located at 1401 North Halsted Street, testified that while he was on duty on January 22, 1969, he noticed five men cross the street and proceed onto the station driveway at approximately 11:00 P.M. Three men, including the defendant, and a man whom he identified as Major Nunnery then entered the station. Nunnery and the defendant went to the counter and discussed a purchase while the third man remained by the door. When he turned his head to look out the window at the driveway, the defendant stepped around the counter, stuck a gun into his side, and said, "This is a stick up." Nunnery then went behind a partition to the back of the station and took $150.00 to $175.00, a .32 caliber revolver, and some bullets, and after returning, gave the gun to the defendant. The defendant threatened to shoot if Mansker did not open the station safe, but Mansker replied that he could not open the safe. When the man at the door said, "Let's go before the police come," the three men left.

Mansker was again robbed at the gasoline station on February 9, 1969, by Major Nunnery and another man. Three days later, on February 12, 1969, he went to Chicago Police Headquarters at 11th and State where he was shown 100 to 150 photographs. He recognized two photographs of the defendant as pictures of one of the men who robbed him on January 22, 1969. Over a month later, on March 25, 1969, Mansker went to Felony Court to testify in the case involving Major Nunnery. While he was waiting outside the Court, he observed the defendant in a group which included ten to fifteen male Negroes, and he identified the defendant to a policeman. A complaint was issued on that same day charging the defendant with armed robbery.

Patrolman Eugene Earl, who attached to Gang Intelligence, Chicago Police Department, testified that at approximately 1:30 A.M. on January 25, 1969, he and his partner responded to a call reporting a man with a gun at 80 North Sedgwick Street. As they drove south on Sedgwick, he observed the defendant walking north. After driving past him, they turned around and pulled up next to him. The defendant started to reach into his coat, but Earl caught the defendant's hand, reached inside his sweater, and pulled out a revolver. The defendant was placed under

arrest and charged with the offense of possessing a concealed weapon. The revolver which the defendant possessed on January 2, 1969, was the one which had been stolen three days earlier from Mansker.

The defendant took the stand in his own behalf and testified that he was in his apartment with several named friends on the night of the robbery and that he did not leave his apartment in the period from January 20, 1969, to January 24, 1969, because during that time he had been recuperating from the Hong Kong flu. He left the apartment at about 11:00 P.M. on January 24, 1969, when he went to a tavern at 807 North Sedgwick with some friends. While he was there, he was informed that someone wanted to see him outside. He left and walked into the mouth of an alley next to the tavern where a man named, Hawk, attempted to rob him. After a struggle, Hawk "more or less left the gun with me" and ran. The defendant, returned to the tavern, but soon departed. When the police car pulled up, he walked over to it; and as he was about to turn over the revolver, the policeman took it after telling him to freeze.

After giving this testimony, the defendant faced the judge, opened his mouth, and exhibited his teeth so that the judge could see a gold cap on one of his front teeth which was shaped like a four leaf clover. It was stipulated that if Dr. Jack Milstead, a dentist, were called as a witness, he would testify that on December 13, 1967, he installed a gold crown with the design of a four leaf clover on one of the defendant's upper front teeth.

■■   The defendant first contends that he was not identified as the robber beyond a reasonable doubt. He argues (1) that the identification was vague, uncertain, and doubtful, and (2) that Mansker's failure to observe the gold crown on his tooth casts grave doubt on the reliability and credibility of the identification. Mansker testified that the gasoline station was well lighted and that he was standing only five feet away from the defendant during the robbery. He emphasized that "[t]he whole time I was discussing I couldn't open the safe to him I was looking in the face." The testimony of a single witness is sufficient to identify an accused as an offender and to sustain a conviction, even though such testimony is contradicted by the accused, provided (1) that the witness had adequate opportunity to view the offender and (2) that the in-court identification is positive and credible. (*People v. Martin,* 4 Ill.2d 331, 265 N.E.2d 685.) Here Mansker looked directly into the face of the robber in a well lighted gasoline station, and his identification at trial was positive and unshaken by vigorous cross-examination.

■■   It is not necessary for a witness who makes a positive identification to give a precise and accurate description of an offender's facial

characteristics. (*People v. Miller,* 30 Ill.2d 110, 195 N.E.2d 694.) The trier of facts, nevertheless, in evaluating the reliability and credibility of an identification must consider the failure of a witness to observe and report a clearly visible feature. (See *People v. Charleston,* 11 Ill.App.2d 190, 253 N.E.2d 91.) A gold crown on a front tooth, unlike a scar or a moustache, is not necessarily clearly visible because teeth are often covered by a person's lips even when the person's mouth is open. At trial, the defendant displayed the gold crown to the trial judge, but when this same argument was presented to him, he commented:

> With regard to the issue of the gold tooth, I never did see it even when you stood on the stand I didn't see it and I have seen you in court here a number of times, I have never noticed a gold tooth you have.

■■ In view of the record before us, we feel that Mansker's testimony was sufficient to sustain the conviction and that the failure to observe the gold crown does not discredit the identification. We must note, in addition, that the identification was corroborated by the fact that the defendant had the stolen revolver in his possession at the time of his arrest.

The defendant relies heavily upon *People v. Kincy,* 2 Ill.App.2d 419, 219 N.E.2d 662, and *People v. Marshall,* 4 Ill.App.2d 483, 221 N.E.2d 133. In *Kincy,* a clerk employed at Pekin Cleaners was robbed of $18.00 at gunpoint, by a man who fled when customers entered the premises. One of the customers followed the robber and then pointed out the defendant to the police who arrested him less than twenty minutes after the commission of the crime. At the time of his arrest, the defendant had $6.10 less than the $18.00 taken in the robbery. According to the testimony of one of the arresting officers, the complainant identified the defendant at a showup "according to his jacket." At trial, she identified the defendant as the robber, but at no time did she state that she saw the face of the robber and at no time did she mention whether the robber had a prominent black moustache which the defendant had at the time of trial. Also she was not positive as to the color of the jacket. The defendant interposed an alibi defense. The Appellate Court noted (1) that the jacket upon which the identification was based was not introduced into evidence; (2) that the defendant at the time of his arrest, shortly after the robbery, had less money than had been stolen; (3) that the customer who allegedly followed the robber and pointed out the defendant, did not testify at trial; (4) that no one testified to seeing the robber's face; and (5) that the defendant's alibi did not tax credulity. Viewing the record as a whole, the Appellate Court held that the defendant was not proved guilty beyond a reasonable doubt. The reversal was not based

just upon the attendant's failure to observe the prominent moustache, but resulted from an evaluation of the totality of the circumstances.

In *Marshall*, the complaining witness, Robert Troxell, just after he was robbed, described the man who robbed him to the police as a colored man, with a black moustache, about 20 years old, and 5 feet 10 or 11 inches tall. The defendant was only 5 feet 6 inches tall. At trial, Troxell was not certain whether the robber had a moustache. Troxell explained that this uncertainty existed because he "didn't look that close." The Appellate Court noted that Troxell's uncertainty concerning the moustache was evidence that he had not observed the robber's face carefully. This, in combination with the discrepancy in height, cast serious doubt on the identification, and the Appellate Court reversed the conviction. Here in contrast to *Marshall* and *Kincy*, Mansker stated unequivocally that he looked directly into the robber's face under well lighted conditions and from a few feet away. The record does not cast doubt upon this testimony.

The defendant next contends that he was identified improperly through a highly prejudicial method. He argues, "We don't think the identification of the defendant was properly made. There never was a lineup. The defendant was identified by photographs before he was apprehended. It is always a question whether an identification made after viewing pictures is not in fact an identification of the picture and not the man."

On February 12, 1969, Robert Mansker was shown 100 to 150 photographs, and he recognized two pictures of the defendant. This viewing of the photographs occurred prior to the defendant's arrest on the robbery charge and was a part of the police investigation. On March 25, 1969, while waiting outside of the Felony Court to testify in a case involving Major Nunnery, Mansker recognized and identified the defendant who was standing outside the same Court in a group including 10 to 15 male negroes. The circumstances of this identification in the crowd outside the courtroom adequately explained the fact that no lineup was conducted.

The United States Supreme Court in *Simmons v. United States*, 390 U.S. 37, considered the claim that a pretrial identification by means of photographs was in the circumstances of that case so necessarily suggestive and conducive to misidentification as to deny the defendant due process of law. The Court recognized both the usefulness of photographic identifications in investigating criminal activities and the dangers of misidentification inherent in such procedures. After careful consideration it refused to prohibit the use of photographic identification procedures and held "that each case must be considered on its own facts, and that

convictions based on eyewitness identication at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384.

■■■ In applying the standard set forth in *Simmons* it is necessary to consider (1) the opportunity which the witness had to view the offender, and (2) the circumstances surrounding the photographic identification. (*People v. Holiday*, 47 Ill.2d 300, 265 N.E.2d 634.) In the present case, as pointed out above, Mansker had adequate opportunity to observe the defendant during the robbery under well lighted conditions. Subsequent to the robbery, Mansker was shown 100 to 150 photographs from which he recognized two pictures of the defendant. There is no testimony in the record before us which would indicate that Mansker's identification of the photographs was prompted by anything other than his own recollection of the robber's appearance. After considering the facts and circumstances of the present case, we cannot say that the photographic identification procedure used was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. See *People v. Watkins*, 46 Ill.2d 23, 263 N.E.2d 115, and *People v. Thomas*, 127 Ill.App. 2d 444, 262 N.E.2d 495.

It is finally contended that the defendant was deprived of due process of law as guaranteed by the Sixth Amendment to the Constitution of the United States when the trial court refused to issue warrants for the arrest of three subpoenaed witnesses who did not appear on the date of trial. We find no merit to this contention.

■■ An examination of the record discloses that the cause was set for trial with subpoenas on October 29, 1969. Hearings were held on the motions to suppress, and the trial was reset for November 3, 1969. On that day, the defendant answered ready and waived trial by jury. Prior to trial, defense counsel stated that he had personally served subpoenas to appear on earlier court dates, upon four witnesses for the defendant, and that only one of the subpoenaed witnesses was present. It was counsel's understanding that all the subpoenas had been continued from time to time so that it was unnecessary for him to serve subpoenas again. He requested that warrants issue for the arrest of Major Nunnery, a co-defendant who had been discharged under the Four Term Act (Ill. Rev. Stat., 1969, Ch. 38, par. 103—5), for a Willie Mae Williams, and for an Ernest Jefferson. The Court ruled that counsel's personal service was improper and that the subpoenas should have been given to the Sheriff for service. When the request for warrants was denied, defense counsel stated, "I can't ask for a continuance because I don't know where they

are. I have no reasonable hope of finding them without the assistance of the Sheriffs office. The defense is ready for trial, Your Honor." The defendant clearly waived his right to compulsory process by demanding immediate trial and by not requesting a continuance in order to find and properly subpoena the witnesses. See *People v. Brown,* 64 Ill.App.2d 203, 212 N.E.2d 275.

For the reasons set forth above, the Judgment of the Circuit Court is affirmed.

Judgment affirmed.

ADESKO, P. J., and DIERINGER, J., concur.