THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT S. HUNT, Defendant-Appellant.

(No. 60644; )

First District (2nd Division)—November 25, 1975.

*Rehearing denied December 29, 1975.*

Paul Bradley, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Robert S. Hunt, was indicted for the crime of rape. (Ill. Rev. Stat. 1973, ch. 38, par. 11—1.) After a bench trial, defendant was found guilty and sentenced to imprisonment for a term of 4 to 12 years. On appeal defendant contends that he was not proven guilty beyond a reasonable doubt and, alternatively, that the trial court improperly imposed a maximum sentence of three times the mandatory minimum. The record reveals the following:

The complainant testified that on the evening of October 4, 1972, at approximately 11 p.m., she was walking north on Colfax Avenue to her

home at 77th and Colfax. She noticed a man, whom she later identified as defendant, walking in the same direction on the other side of the street. When she crossed 78th Street, defendant crossed to complainant's side of the street and followed her to her door where he grabbed her from behind. Defendant placed an object to her head and cautioned her not to scream or he would kill her.

After blindfolding complainant with her head scarf, defendant dragged her to a gangway. While endeavoring to defend herself, she removed her blindfold and also a 6-inch switchblade from her pocket. Defendant took the knife from her, stating that he had already killed two women and wouldn't think anything of killing her if she "tried anything else."

Complainant was then taken to her apartment. On the way up the stairs to the apartment, defendant asked if anyone was home. When she answered "no," defendant warned her that she would be the "first one to get it" if she was lying. Defendant held the switchblade to her temple as she opened the door. Defendant then searched the apartment. The only light at this time was that which came from the living room television which had been left on. Defendant then took complainant into the bedroom, removed his jacket and pants and all of her clothes. He pushed her on the bed and demanded that she perform an act of fellatio. She refused, whereupon defendant raped her.

During the act, the telephone rang six or seven times. Finally, defendant permitted her to answer it while he stood behind her. Complainant pretended to carry on a conversation over the phone, even though the caller had already hung up. She informed defendant that the caller was her fiance and that he was coming over to her apartment. Defendant then began to put on his clothes. At this time, complainant flipped on the ceiling light and looked at her assailant. It was approximately 5 minutes from the time the light was turned on until defendant had finished dressing; the entire ordeal, from the moment defendant first grabbed her until he left her apartment, lasted for approximately 15 minutes.

After defendant departed, complainant dressed and called the police. Police Officer LeMar Thomas responded to the call at approximately 11:30 p.m. Complainant testified that she described the rapist to the policeman as being approximately 6 feet tall, between 23 and 25 years old, approximately 165 pounds with an unkept natural, dark skin and a prominent scar on his right cheek. After relating the incident to the police, she was taken to South Shore Hospital for an examination.

Approximately 4 months later on February 7, 1973, complainant testified that she and her fiance were at the White Castle restaurant at 79th and Essex. As they were about to depart, she observed defendant enter-

ing the restaurant. Defendant and complainant looked directly at each other whereupon defendant made a "u-turn" and got back into the Checker Cab he was driving. As defendant drove way, complainant took down his license number, 3664, and communicated it to the police.

On redirect examination, complainant reiterated that she had, on the night of the attack, related to police that her assailant had a prominent scar on his right cheek. After having left the witness stand to view defendant, complainant stated that the scar which defendant now had on his right cheek was not as prominent as the scar which she viewed on the night of October 4, 1972. Defendant's present scar was as long as, and running in the same direction as, the scar which she had earlier identified, but it was not as prominent. She speculated that it may have healed over or been removed.

Police Officer LeMar Thomas testified that on October 4, 1972, he interviewed complainant. She described the man who raped her as a male Negro, approximately 6 feet tall, 24 to 27 years old, and very dark complected. No other physical description was given. Officer Thomas then drove complainant around the immediate area in an attempt to spot the assailant. Failing in the attempt, the officer drove complainant to the South Shore Hospital where she was treated.

Police Officer John McCabe, assigned to the investigation of the case, testified that complainant described the rapist to him, 2 or 3 days after the rape, as a male Negro, 24 to 27 years old, 6 feet tall, 185 pounds, brown eyes, very dark complexion with black hair worn in a short natural. No mention of a scar was made in the description.

Officer McCabe was again contacted in February of 1973, after complainant had seen her assailant at a White Castle restaurant. He conducted an investigation at the Checker Cab garage where he was advised that Robert Hunt drove cab # 3664 on February 7, 1973. Referring to a report prepared on February 7, 1973, by Chicago Police Officer N. Smith, the witness stated that complainant described the cab driver's face as bearing a scar on his right cheek. Officer McCabe's supplemental report of March 6, 1973, however, reflected that the scar was on the cab driver's left cheek.

Frank Williams, a former coemployee of defendant, testified for the defense. He stated that on October 4, 1972, both he and defendant worked for Clark Service Station, 7710 Cottage Grove, as gas station attendants. They both arrived at the station that day at 2:30 p.m. and left work at 11:15 p.m. when the witness drove defendant home. During the entire period of time, defendant never left Williams' view. Between 10:45 p.m. and 11:15 p.m., he and defendant took inventory and jointly prepared the inventory sheet.

On cross-examination, Williams testified that he had known and worked steadily with defendant for 2 years. He independently recalled the day of October 4, 1972, and did not refresh his memory by checking any written records or memoranda prior to his court appearance. He recalled that he brought two bologna and cheese sandwiches to work and that he worked from 2:30 p.m. to 11:15 p.m. on the day in question. He explained that although the employees were allowed only 8 hours, they generally put in more time, and that on October 4, 1972, both he and defendant worked for almost nine hours. They did not punch a time clock, but would inform their employer of the amount of time they had worked; the employer would then verify the time with the midnight shift man who normally would arrive at 10:45 p.m. The witness could not recall the name of the midnight shift man on October 4, 1972. Every night after work, he would drive defendant to his home at 74th and Princeton.

On redirect examination, the witness was shown the October 4, 1972, inventory sheet. The names Frank and Robert appear on the sheet for the second shift and indicate that each worked for eight hours.

Defendant, Robert Hunt, testified that on October 4, 1972, he worked at the Clark Gas station located at 7710 Cottage Grove. He arrived at work at 2:30 p.m., actually started work at approximately 2:45 p.m., and left for home at about 11:15 p.m.; he did not leave the gas station for that entire period. Defendant testified that he prepared the inventory sheet for the second shift and that the second shift hours were from 2:30 p.m. to 10:30 p.m.

Defendant denied raping complainant and denied having ever seen her until a court hearing on March 12, 1973. He denied having driven a cab on or about February 7, 1973, and denied having seen complainant on that date. He stated, however, that he had been employed by the Checker Cab Company, but that he left its employ on February 8, 1973, to assume a position with the United States Post Office. The notification of his employment with the United States Post Office, dated February 8, 1973, was introduced into evidence.

On cross-examination, defendant testified that he was 22 years old, 5 feet 9 inches tall, 170 pounds and had short black hair. He stated that he wore street clothes to work, changed into a gas station uniform, and changed back into street clothes when he left work. He always accurately reported his time worked; he would never mark down any more or any less time than he was actually entitled to. Defendant recalled smoking "about four" cigarettes on October 4, 1972, and eating a bologna and cheese sandwich for lunch. He was able to recall what he had eaten for lunch on October 4, 1972, notwithstanding the fact that a year and

a half had since passed and he had never before been asked to recall what he had eaten on that day. On the night complainant was raped, defendant testified that he went directly home after work. He briefly talked to his mother and step-father and then watched a "John Wayne" movie on television.

In rebuttal, Mrs. Theresa Rosanova, payroll supervisor for the Checker Cab Company, testified that defendant had driven cab # 3664 on the 6th and 7th of February and that he had also taken cab # 4971 on the afternoon of February 7. The trip sheet indicated that cab # 3664 was returned to the garage at 2:36 a.m. on February 7, 1973, and that the last fare was dropped off at 79th and Jeffrey.

Complainant was then recalled to the stand and testified that 79th and Essex, where she saw defendant's cab # 3664 on February 7, 1973 at 1:30 a.m., is five blocks from 79th and Jeffrey.

Defendant contends that the evidence was insufficient to support the conviction in that it rested entirely upon an identification which was doubtful and uncertain and was directly contradicted by the corroborated alibi testimony of defendant. The gravamen of defendant's contention is that although complainant testified that after the rape occurred she described her assailant to the police as having a prominent scar on his right cheek, this was contradicted by the two police officers who testified that the descriptions in their reports contained no mention of a scar. This contradiction, defendant concludes, failed to produce an abiding conviction of guilt.

■■ It is well settled that identifications which are vague, doubtful, or uncertain will not support a conviction. (*E.g., People v. Gardner*, 35 Ill.2d 564, 221 N.E.2d 232.) Equally well settled, however, is that the testimony of one witness, who had ample opportunity to form a positive identification, is sufficient to convict even though such testimony is contradicted by the accused. (*E.g., People v. Stringer*, 52 Ill.2d 564, 289 N.E.2d 631.) The totality of the facts and circumstances in each case must be examined in order to determine the reliability of the complaining witness' testimony. (See *People v. Williams*, 60 Ill.2d 1, 322 N.E.2d 819.) In evaluating identification evidence, consideration should be given to the opportunity of the witness to view the accused at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the accused, and the level of certainty demonstrated by the witness at the confrontation. (*Neil v. Biggers*, 409 U.S. 188, 34 L.Ed.2d 401, 93 S.Ct. 375.) Applying these principles to the instant case, we find that the identification testimony was sufficient to support the conviction.

■■ The complaining witness had ample opportunity to view her as-

sailant under favorable conditions. She testified that when defendant began dressing, she flipped on the ceiling light in the bedroom and for approximately 5 minutes was able to get a "good look" at the man who had just raped her. The substantial opportunity which complainant had for observing defendant, in terms of proximity, time and lighting conditions, weighed heavily in the decision of the trial judge:

> "I watched the young lady. I tried to judge. I think that she was telling the truth. Five minutes is an awful, awful, awful long time to look at somebody who is putting on his pants with the lights on in the room."

That complainant's opportunity to observe her assailant resulted in a positive identification is borne out by the accuracy of the description which she gave to police shortly after the occurrence and by the fact that she was able to immediately recognize defendant in the nonaccusatorial setting of a restaurant 4 months later. In our opinion, the positive identification made by complainant was not rendered doubtful or uncertain because the police reports failed to mention a scar on defendant's right cheek.

■■ . Precise accuracy in describing a defendant's facial characteristics is unnecessary where the identification is positive. (*People v. Miller,* 30 Ill.2d 110, 195 N.E.2d 694.) The question of an identifying witness' failure to notice a facial scar is not a prerequisite to an identification, but only goes to the weight to be attached to the identification testimony. (*People v. Robinson,* 3 Ill.App.3d 843, 279 N.E.2d 526; *People v. Brown,* 15 Ill.App.3d 879, 305 N.E.2d 337.) Likewise, the failure of a witness to report the presence or absence of a clearly visible facial characteristic has been held to be solely a question of the weight to be afforded the identification. (*People v. Arroyo,* 18 Ill.App.3d 187, 309 N.E.2d 804; *People v. Henderson,* 133 Ill.App.2d 336, 273 N.E.2d 244.) Here, there was a discrepancy between complainant's testimony that she told the police of the scar on defendant's right cheek and the police reports which did not mention a scar. We do not view this discrepancy or omission, and the inferences possibly arising therefrom, as crucial, but merely as one factor to be considered in determining whether the identification testimony was clear and convincing. As stated in *People v. Wright,* 3 Ill.App.3d 829, 833, 279 N.E.2d 398, 401:

> "Clear and convincing evidence, however, is not synonymous with uncontradicted or unimpeached testimony. Minor variances in the testimony may occur and, if so, these variances constitute mere discrepancies going only to credibility. (*People v. Jackson* (1963), 28 Ill.2d 566.)

It is the task of the trier of fact, here the court, to weigh these

discrepancies in light of all the other testimony in reaching its decision. If it is found that the discrepancies are so minor as not to detract from the reasonableness of her story as a whole, the testimony of the prosecutrix may be found to be clear and convincing. [Citations.]"

We judge that the discrepancy between complainant's testimony as to her initial description of defendant and the account thereof in the police report is not of a nature so substantial as to create a reasonable doubt of defendant's guilt.

■■ In alleging the State's failure to meet its burden of proof, defendant further points to the alibi testimony of defendant and Frank Williams. It is argued that the testimony stands uncontradicted that defendant was at work when the crime was committed. We are referred to cases holding that plausible evidence of an alibi cannot be disregarded where the only evidence contradicting it rests upon the identity of defendant as the perpetrator of the crime charged, and where the entire record reveals reasonable doubt of guilt because of an uncertain identification. (*People v. Gardner,* 35 Ill.2d 564, 221 N.E.2d 232; *People v. Martin,* 95 Ill.App.2d 457, 238 N.E.2d 205.) Although correct as an abstract proposition of law, the rule urged by defendant is inapplicable to the present case. Here, the identification of defendant as the perpetrator of the crime was positive. Moreover, the credibility of the defense witnesses was impeached and strained at several junctures. Defendant denied driving a cab on February 7, 1973, yet his own trip sheets demonstrate that he drove cab # 3664 on that date. Both defendant and Frank Williams could, however, recall that they ate a bologna and cheese sandwich for lunch a year and a half prior to their testimony. Defendant also recalled smoking four cigarettes and watching a "John Wayne" movie on October 4, 1972. These statements provided a poor foundation for the construction of the alibi defense that defendant worked almost 9 hours on October 4, 1973, even though he was "allowed" only 8 hours time. Under these circumstances, the province of the trier of fact to believe certain witnesses and disbelieve others will not be infringed upon. *People v. Nicholson,* 55 Ill.App.2d 361, 204 N.E.2d 482.

■■ Lastly, defendant contends that the trial court erred in construing the sentencing statute for a Class 1 felony as requiring the imposition of a maximum term of years which is three times the minimum term imposed. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(2).) Defendant was properly sentenced under the Unified Code of Corrections to a minimum term of 4 years. (Ill. Rev. Stat. 1973, ch. 38, pars. 11—1(c), 1005—8—1(c)(2).) Regarding the imposition of the maximum term of 12 years, the record reveals that the court did not assume that

the one to three ratio required in lesser offenses by the Code (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(o)(3) and (4)) was also required for a Class 1 felony. Rather, the trial court expressly stated that it was the court's custom to follow the standard for sentencing set by the American Bar Association that the maximum term be three times the minimum term imposed. (*People v. Cox,* 21 Ill.App.3d 728, 315 N.E.2d 615; *People v. Kincaid,* 21 Ill.App.3d 851, 316 N.E.2d 220; *People v. Jones,* 21 Ill.App. 3d 791, 315 N.E.2d 921.) We find no abuse of discretion in the imposition of the sentence.

For the reasons stated, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

DOWNING, P. J., and LEIGHTON, J., concur.