THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ISIAH BRAXTON (Impleaded), Defendant-Appellant.

First District (1st Division)   No. 78-1163

Opinion filed February 11, 1980.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Ellen M. Flaum, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

On July 21, 1977, Isiah Braxton and James Gore were charged by information with the offense of armed robbery. On September 22, 1977, the assistant public defender appointed to represent Braxton filed an answer to the State's discovery motion. On December 9, 1977, immediately prior to trial, Braxton was denied leave to amend the answer. Braxton waived his right to trial by jury and proceeded to a bench trial which was conducted simultaneously to but separately from the jury trial elected by James Gore. Braxton was found guilty as charged and on January 13, 1978, was sentenced to imprisonment of not less than four years nor more than eight years. Braxton appeals.

On appeal, Braxton contends that (1) the trial court erred by denying defendant's motion, made on the day of trial, to amend his answer to discovery; (2) the in-court identification of the defendant by the complaining witness was insufficient to sustain the conviction for armed robbery; (3) testimony regarding the complaining witness' out-of-court identification of the defendant and the weapon alleged to have been used in the armed robbery was hearsay evidence and therefore improperly admitted; (4) defendant was denied his right to a fair trial when the State was permitted to introduce into evidence a weapon which was not connected to the offense for which defendant was charged; (5) the right to confront and cross-examine his accusers was violated because the trial court refused to allow cross-examination of the complaining witness regarding his testimony at the preliminary hearing; and (6) comments by the State during closing argument denied defendant his right to a fair trial.

We affirm.

The defendant Isiah Braxton and his co-indictee James Gore were charged by information on July 21, 1977, with the offense of armed robbery. Braxton waived a jury trial while Gore elected trial by jury. Both trials were conducted simultaneously.

On September 22, 1977, the assistant public defender appointed to represent Braxton filed an answer to discovery in which he stated that Braxton's defense would be the inability of the State to prove Braxton's guilt beyond a reasonable doubt. The answer listed as possible witnesses the defendant, those persons named in the State's answer to discovery and in police reports, and those who previously testified in hearings on the cause. On Friday, December 9, 1977, the day of trial, defense counsel sought to amend his answer to assert the defense of alibi and include the wife of defendant, Thelma Braxton, as a witness. He stated that he had given the State notice of amendment on Wednesday and made Mrs. Braxton available on Thursday for interviewing by the State. The trial court denied the motion to amend, and stated that by waiting until the

117th day of the term to inform the State of the intention to assert an alibi defense, the defense had precluded the State from making a meaningful investigation of any witnesses to that defense.

Defense counsel then made a motion *in limine* to exclude evidence of other offenses and prior convictions. The trial court ruled that the State could introduce only evidence showing that the defendant was arrested by officers responding to a call unrelated to the instant offense and that two weapons were then confiscated. The nature of the arrest and the proceeds confiscated during the arrest could not be introduced. The court also ruled that a prior conviction could be introduced for impeachment purposes if the defendant chose to testify.

The State's first witness, complainant Garnett Baskerville, testified that on June 6, 1977, at approximately 2 p.m., he arrived at his mother's apartment at 8004 South Langley with his roommate James Henri to remove the remainder of his belongings. The witness had moved from his mother's apartment the previous day. The witness' cousin Emilinon Desadier, met them at the apartment and at approximately 2:30 p.m. the men had completed carrying the belongings from the apartment to the car. Henri remained in the car while Baskerville and Desadier returned to the apartment to make certain that the doors were locked. As Baskerville started to close the door to the porch at the back of the apartment, it was forced open and the witness observed four men outside the door. He identified two of these men as being Braxton and Gore. He stated that, at the time, Braxton was holding a short-barrelled, black gun which he proceeded to point at Baskerville's head. Baskerville then identified People's exhibit 1 as the gun Braxton was holding. The identification was based on the size and color of the gun. The witness also testified that the lighting conditions were fairly bright.

Further testimony revealed that after the door was forced open, Braxton put his hand on Baskerville's shoulder and pushed him approximately 5 or 6 feet into the living room and onto the floor. While on the floor, Baskerville was able to look into a mirror on the wall three feet away and observe his assailants. Braxton remained in the living room and placed the barrel of the gun behind the witness' ear. Another man went to the rear of the apartment and Gore and a fourth man entered Baskerville's mother's room. Braxton then told Baskerville that he would "take [him] out of the game" if he moved or tried to look at him and placed his foot on the upper part of Baskerville's back. Braxton kept the gun pointed at Baskerville. Baskerville testified that Gore returned to the living room from the bedroom after about 15 seconds. Braxton asked the witness if he had any money. Baskerville stated that he did have money and removed $35 from his left-hand pocket. This money and a gold ring with a diamond chip were taken from Baskerville. Braxton took the ring, but the witness

was not certain who took the money from his hand. During this time, Baskerville could hear drawers and a closet door in his mother's room being opened and closed. He then heard a commotion in the rear of the apartment and the man who had gone back there ran out. The other three men followed him.

Baskerville immediately ran to a window facing Langley Avenue and saw the four men running down the street to the right of the apartment building. The witness testified that Braxton was wearing a black leather jacket, black pants and top, a black hat, and sunglasses, and that the hair on his face was beaded up. He also stated that Braxton was five feet seven or eight inches tall and that Gore, who was six feet one or two inches, "towered over" Braxton. Gore was wearing light green pants and a green shirt with flowers. Baskerville called the police after the assailants fled and spoke with them when they arrived.

Baskerville had no further contact with the police until June 16, 1977. On this day, he received a call from his mother at 10 or 10:30 a.m. and, as a result, went to the police station at 85th and South Green with his roommate James Henri. As Baskerville entered the police station he observed Braxton handcuffed to a wall in a room off the lobby area. He immediately informed a lieutenant in the station and told Officer Higgins that Braxton was the person who had robbed him at his mother's apartment. He also identified a gun (People's exhibit No. 1) as the gun that he believed was used by Braxton during the robbery.

On June 17, 1977, Baskerville attended a preliminary hearing against Braxton. While before the bench, the witness observed Gore standing in back of the courtroom. As Baskerville pointed out Gore to Officer Higgins, Gore left the courtroom. Higgins and Baskerville followed and Officer Higgins apprehended Gore outside the building.

On cross-examination by defense counsel Baskerville testified that he gave a description of Braxton to the officers responding to the call. He also testified that he had told the assistant State's Attorney and Officer Higgins about the mirror in the living room, but that he did not recall if he told the officers who responded to the call about it. Counsel then asked the witness if he had testified at the preliminary hearing to observing Braxton in the mirror; however, the State's objection to the question was sustained.

Derenza Baskerville, the complainant's mother, testified that on June 16, 1977, she lived at 8004 South Langley, Chicago. At approximately 8 a.m. she left her home for work. While at work, she received a phone call from her niece and, as a result, phoned her home and spoke with a police officer. She then called her son, Garnett Baskerville, and went to the police station at 85th and South Green. When Derenza Baskerville arrived at the police station, she was directed to a room to the right of the front desk. Garnett Baskerville arrived at the station approximately 10 or 15

minutes later. Mrs. Baskerville went to the front desk to meet her son and as she approached the front desk, she heard him inform the police officers that the individual sitting in the room to the left of the front desk was one of the men who had robbed him. The witness had an opportunity to see the individual in that room and identified him as the defendant Braxton. She then identified People's exhibits 1 and 2 as guns which she first observed at the police station, but she could not identify either gun as her property.

Derenza Baskerville then described the mirror on her living room wall as approximately 4 feet by 4 feet in dimension. It was placed at 3 feet above the floor. She also stated that the living room had a large bay window and that the drapes were always drawn open in the morning.

Officer Richard Gesiorski of the Chicago Police Department testified that on June 16, 1977, while on duty in uniform and in a marked squad car, he received two successive radio assignments directing him to 8004 South Langley and 8021 South Champlain. These two locations are directly across the alley from each other. The officer drove into the alley and stopped 15 to 20 feet behind a white 1966 Dodge. Officers Hurd and Higgins had also arrived at this location. Officer Gesiorski observed a man whom he identified as Braxton, sitting behind the steering wheel of the Dodge. As Officer Gesiorski exited the squad car, Braxton exited from his vehicle and began running from the officer. Gesiorski drew his revolver and told Braxton to halt. Braxton stopped, was searched, and placed under arrest by Gesiorski who then turned defendant over to Officer Hurd for transport to the police station.

Officers Gesiorski and Higgins proceeded to inspect the Dodge. Through the open door on the driver's side of the car, Gesiorski testified that he observed a brown bag with two revolver handles protruding from it in the middle of the front seat. Next to the bag was a black plastic wallet containing State of Illinois picture identification cards and a medical eligibility card for James Gore and an Illinois driver's license issued to Walter Jones. The officer then identified People's exhibits 1 and 3, a C.B.M. .22-caliber revolver and six live .22-caliber rounds, and People's exhibits 3 and 4, a Smith and Wesson .38-caliber revolver and five live .38-caliber rounds, as those items recovered from the brown bag inside the Dodge. He identified People's group exhibit 5 as the wallet and identification found in the vehicle along with the weapons.

Gesiorski brought these items to the police station. When he entered the station, he observed Braxton handcuffed to a wall in an interview room to the left of the front desk. The items recovered were inventoried by Officer Higgins and placed in the police property room. Gesiorski did not see them again until the week of trial when he transported them from the property room to court. Further testimony confirmed the report of

defendant's arrest which indicated that Braxton was 21 years old, 5 feet 8 inches tall, weighed 175 pounds, wore his hair in a "natural," and had sideburns or a beard.

William Higgins, also a police officer, testified that while he and his partner Officer Hurd were on duty on June 16, 1977, they received a simulcast directing them to 8004 South Langley. While enroute to this location, they received a second simulcast directing them to 8021 South Champlain. They drove to an alley at the rear of the latter address where they saw a parked white Dodge. A man, later identified by Higgins as the defendant, was seated in the vehicle. As Higgins approached the Dodge, he observed Officer Gesiorski approaching the car on foot. Braxton then fled from the car, but Higgins gave chase and succeeded in stopping him by calling halt. Braxton was patted down and arrested.

Officer Higgins further testified that after Braxton's arrest, he and Officer Gesiorski looked into the Dodge and observed a brown bag with two gun handles protruding from it on the front seat. He identified People's exhibits 1 and 2 as the weapons recovered from the vehicle and People's exhibit 5 as the wallet found on the floor on the driver's side of the front seat. Thereafter, Higgins left a notice for Mrs. Baskerville at her apartment at 8004 South Langley and drove the Dodge to the 6th District police station.

While at the police station, Higgins observed the defendant handcuffed to a wall in the interview room. At approximately 11 a.m. Mrs. Baskerville arrived at the station. Her son, Garnett, entered shortly thereafter. Garnett Baskerville identified Braxton as the man who had robbed him and after having seen the guns which were recovered from the Dodge, identified the .22-caliber revolver as the one used in the robbery. Higgins stated that he believed Baskerville identified the defendant as the person who had robbed him before he was shown the weapons.

The police report prepared by Officer Gesiorski was adopted by Higgins. Higgins testified that although the report made no mention of facial hair or a kerchief, the defendant did have facial hair and was wearing a kerchief at the time of his arrest. Higgins also testified to Garnett Baskerville's identification of James Gore on June 17, 1977, at the preliminary hearing for Braxton.

People's exhibits 1, 2, 3, 4 and 5, the recovered weapons, ammunition, and wallet, were admitted into evidence over defendant's objection. People's exhibit 6, a certified copy of an application for a 1966 license for a 1966 Dodge in the name of James Gore, was admitted into evidence without objection.

The parties stipulated that if Officer Cornish were to testify, he would state that he prepared a report of the armed robbery following an

interview with Garnett Baskerville. Baskerville provided descriptions of the four offenders. The first offender, identified as Braxton was described as a male Negro, age 24, 5 feet 10 inches tall and 150 pounds. He also had a beard or sideburns and was wearing a black hat and black clothing. Because the descriptions of the others are not involved in this appeal, we need not repeat them.

■■ On appeal, Braxton first contends that he was denied his right to present a defense when the trial court denied his motion to amend the answer to discovery to include the defense of alibi. The defendant further argues that the court could have imposed a less strict sanction and that it was an abuse of discretion not to do so. However, the exclusion of defense witnesses has been held to be a proper sanction where the facts and circumstances justify such action. (*People v. Short* (1978), 60 Ill. App. 3d 640, 377 N.E.2d 389; *People v. Brown* (1976), 41 Ill. App. 3d 641, 354 N.E.2d 602.) Here, the defendant waited until the 117th day of his term to notify the State of his alibi defense. The sudden discovery of the alibi and production of his wife as an alibi witness at this late date suggests recent fabrication, particularly in light of the fact that the defendant and his wife were married 2 days prior to trial. Furthermore, no evidence was produced showing that the defendant was unaware of his alibi defense and the existence of the alibi witness prior to this date. Therefore, the trial judge did not abuse his discretion in denying the motion to amend the answer to discovery.

Secondly, Braxton contends that Garnett Baskerville's in-court identification of the defendant was insufficient to convict him of armed robbery since Baskerville lacked a sufficient opportunity to view defendant at the time of the crime. Braxton cites the discrepancies between the description given to Officer Cornish after the robbery and that given during trial as evidence of this fact. He further states that the identification was the product of suggestion since defendant was handcuffed to a wall when Baskerville entered the police station on June 16, 1977.

The general rule is that the testimony of one witness is sufficient to convict, provided that the witness is credible and the accused is viewed under such circumstances as would permit a positive identification to be made. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) Identification of the accused is an evidentiary matter. (*People v. Smith* (1977), 52 Ill. App. 3d 53, 367 N.E.2d 84.) Therefore, discrepancies or inconsistencies in a witness' description of the accused affect only the weight given to such testimony by the trier of fact. *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318; *People v. Hunt* (1975), 34 Ill. App. 3d 472, 340 N.E.2d 203.

■■ We find ample evidence in the record supporting the conclusion that

the witness had a sufficient opportunity to view the defendant both during the commission of the offense and immediately thereafter so as to be able to positively identify him at trial. The robbery occurred at approximately 2:30 p.m. It was a sunny day, the drapes were drawn open, and the hallway was illuminated. The first assailant to enter the apartment was, according to the witness, Braxton. Upon the defendant's forced entry, the witness and defendant were facing each other. After Baskerville had been pushed to the floor, he was able to view the defendant in a mirror hanging in the middle of a wall. When the assailants fled from the apartment, Baskerville observed them as they ran down the street away from the building. Furthermore, the discrepancies in the witness' descriptions of the defendant are not substantial enough to destroy the credibility of the witness' identification of the defendant in view of the fact that Baskerville had an ample opportunity to observe the defendant. See, *e.g., People v. Hunt* (1975), 34 Ill. App. 3d 472, 340 N.E.2d 203.

■■ The defendant's contention that the identification made by Baskerville was the product of suggestion is also without merit. The record indicates that the initial identification occurred as the result of an inadvertent confrontation. Braxton's arrest on June 16, 1977, was in connection with another incident, and notice was left at Mrs. Baskerville's apartment on that day as a result of that incident. When Garnett Baskerville arrived at the police station, he inadvertently observed the defendant in the interview room near the lobby. Accidental confrontations such as this do not vitiate an out-of-court identification where they are " 'immediate, spontaneous, unprompted and positive.' " *People v. Catlett* (1974), 20 Ill. App. 3d 832, 835, 314 N.E.2d 346, 349, quoting *People v. Pardue* (1972), 6 Ill. App. 3d 430, 432, 286 N.E.2d 29, 31.

■■ Thirdly, Braxton contends that the testimony of Mrs. Baskerville and Officer Higgins regarding Garnett Baskerville's out-of-court identification of the defendant and the weapon used during the robbery was hearsay and improperly admitted by the trial court. He states that this evidence tended to bolster the weak and uncertain in-court identifications. However, where the victim who made the out-of-court identification was in court and subject to cross-examination on the matter, it was not reversible error to admit such testimony. (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511; *People v. Ward* (1976), 37 Ill. App. 3d 960, 347 N.E.2d 381.) In *Ward,* the court stated that when the declarant testifies at trial, the basic rationale behind the exclusion of the hearsay testimony is circumvented because the trustworthiness of the testimony can be readily established. (37 Ill. App. 3d 960, 964, 347 N.E.2d 381, 384.) Garnett Baskerville positively identified both the defendant and the weapon used by Braxton during the commission of the offense and the identification was based on his actual view of the defendant at the scene

of the robbery. Hence, the testimony of Officer Higgins and Mrs. Baskerville did not serve as a substitute for the positive in-court identification. Although their testimony was hearsay, it was merely cumulative in nature and therefore, its admission, if error, was harmless. *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.

Fourthly, Braxton argues that the trial court erroneously admitted into evidence the .38-caliber revolver which was recovered from the vehicle in which Braxton was seated immediately prior to his arrest. He contends that because this weapon was not identified as the one used by Braxton during the offense, the evidence had no probative value. He also argues that the admittance was prejudicial in that it suggested to the trier of fact that the defendant had a propensity to commit crimes.

■■ It has been held, however, that a weapon may be the subject of testimony concerning an arrest and admitted into evidence even though no claim has been made that a defendant used this certain weapon in committing a particular crime. (*People v. Magby* (1967), 37 Ill. 2d 197, 226 N.E.2d 33; *People v. McClinton* (1978), 59 Ill. App. 3d 168, 375 N.E.2d 1342; *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529.) Both weapons were recovered from the vehicle at the same time and both were suitable for the crime charged. Therefore, it was not error for the trial court to admit both weapons into evidence.

Defendant's fifth contention is that he was denied his right to confront and cross-examine his accusers when the trial court refused to allow defense counsel to cross-examine the complaining witness regarding the witness' failure to mention at the preliminary hearing that he had observed Braxton in the mirror during the robbery. The extent of cross-examination rests within the discretion of the trial court whose judgment will not be disturbed unless an abuse of discretion is shown. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771; *People v. Noblin* (1973), 15 Ill. App. 3d 1060, 305 N.E.2d 658.) Here, the trial court did not abuse its discretion. In fact, the record indicates that defendant was allowed to cross-examine the complaining witness regarding his statement to other persons concerning the mirror.

■■ Finally, defendant argues that he was denied his right to a fair trial when the State commented, during its closing argument, on the lack of impeachment of its witnesses by the defense from statements possessed by the defense. Also cited as error is the State's suggestion that the defendant and a co-indictee were regular partners in crime, although there was no evidence to support that suggestion. However, the defendant failed to object to the allegedly prejudicial argument. Such failure constitutes waiver of the issue on appeal. (*People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.) Moreover, it has been held that in a bench trial, the judge is presumed to have disregarded improper

remarks made by counsel. *People v. Bennett* (1975), 32 Ill. App. 3d 365, 336 N.E.2d 537.

■■ Furthermore, the remarks by the prosecution that Braxton and his co-indictee Gore were regular partners in crime was invited by defense counsel. When commenting on the introduction of the weapons, he stated:

> "I submit what the State has done is taking what may in fact be the proceeds of another incident and related it back to the original incident and said, 'Look. Here is how we plug up the holes.' And I think that becomes more apparent when we look at who owns that vehicle * * * Mr. Gore. Who is the vehicle registered to * * * Mr. Gore. Whose identification is in the vehicle * * * Mr. Gore."

In cases such as this where the comments by the prosecution were provoked by defense counsel's statements in closing argument, the defendant cannot claim that such comments were prejudicial and erroneous. *People v. Kitchen* (1977), 53 Ill. App. 3d 521, 368 N.E.2d 528.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.