THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT MILLER, Defendant-Appellant.

Second District    No. 80-436

Opinion filed March 27, 1981.

Karl F. Winkler, of Rockford, for appellant.

John S. William, State's Attorney, of Mt. Carroll (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Robert Miller, the defendant, was convicted of the offenses of burglary (Ill. Rev. Stat. 1979, ch. 38, par. 19—1(a)) and theft (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(a)) in a jury trial and was sentenced to the

Department of Corrections for concurrent terms of five years for burglary and two years for theft.

Three issues are presented for review:

(1) whether the defendant was proven guilty beyond a reasonable doubt;

(2) whether the defendant was prejudiced by evidence of other offenses and

(3) whether the prosecutor's closing argument constituted prejudicial reversible error.

The record disclosed the facts as follows: on January 31, 1980, at approximately 5 p.m., August Rosenow discovered five of his calves were gone from an old hog shed on farm property he rented in Chadwick, Illinois. He remembers that at 4 o'clock that morning he had seen a red pickup truck turning around in his driveway about 100 yards away from his house, which was about a mile from the rented farm property. The red pickup truck had white sideboards on it. The tire tracks in the driveway matched those later observed by Rosenow at the doorway of the hog shed. He was not able to see or identify who was in the pickup truck. It was later stipulated that the calves that had disappeared from the Rosenow property were purchased by two men at an auction conducted at the sale barn in Pearl City.

Joseph Herst, an employee of the Pearl City Sale Barn, testified that a red pickup truck with a rack on it arrived at the sale barn at about 6 a.m. on January 31. He could not see into the truck and could not tell how many people came in the truck, although he believed there had to have been at least two because the truck was being driven at the same time he was talking with the person he identified in court as Richard Sisler, the defendant's accomplice. Sisler gave him the cattle in the truck for sale that day, and signed the register as the owner and person to whom the sale proceeds were to be delivered. Auctioneer and part-owner of the sale barn, Dale DeVries, testified regarding sale barn documents showing that Sisler had consigned the calves for sale and that the balance after commissions was payable to Sisler at Post Office Box 64, Savanna, Illinois.

Postal clerk Homer Geison testified that on January 29 he rented a lock box to Sisler and that no one had accompanied him into the post office. Dennis Dyson testified that he had asked the defendant, Robert Miller, to do some work on his red pickup truck and that on January 29, the defendant and Sisler picked up the truck. Defendant and another man, Brad Merkle, were partners in an auto repair and body shop business. Dyson testified his truck had no wood sides. The truck was redelivered to him at 10 a.m. on January 31 by Sisler alone. Defendant's neighbor, Lawrence Rice, testified that on January 29 he saw Dyson's red pickup with a "box" on it parked at the apartment which the defendant

and Sisler shared. Larry Meador, an acquaintance of Sisler, identified the defendant at trial. He said that in late January 1980, when he visited Sisler, he met the defendant, and that they had talked generally about farming and current market prices for crops and livestock. A Carroll County deputy sheriff testified that when he went to arrest the defendant, he found him up against the wall underneath a bed in a friend's home.

The defense presented the testimony of several witnesses to show that the defendant was at a local tavern with them until the tavern closed. The testimony essentially was that the defendant and two others then went to the residence of one of them where all of them either passed out or went to sleep. There was testimony that Sisler also had been at the tavern earlier, but had left about 11 p.m. Sisler next showed up at about 8 a.m. at the house where the defendant had slept. Sisler said he had just had Dyson's truck washed and needed gas and the defendant left to get some. Testimony was also introduced to show that the relationship between the defendant and Sisler was somewhat tempestuous. They argued, especially concerning the amount of time Sisler was supposed to be working at the defendant's shop. The record reflects Sisler identified the defendant at trial, and stated that the defendant and he did engine work on Mr. Dyson's truck. He and the defendant built a rack and put it on the truck. He testified as to conversations with the defendant about stealing cattle and about bills the defendant had to pay, further stating that the defendant planned the whole affair. Sisler testified that during the evening of January 31, the defendant and he left their apartment about 11 p.m. and they drove around the countryside looking for cattle to steal. He and the defendant had to go into the old hog shed to get the cattle out and into the bed of the truck at Rosenow's farm. He further stated he signed the register at the sale barn and was to receive the check from the sale of the calves. Sisler testified he prepared for the theft by renting the post office lock box in his own name and that the defendant was with him at that time. Sisler was arrested at the apartment he and the defendant shared, and testified that defendant initially got the cash to bond him out of jail. He said the defendant told him he sold a welder and an air compressor. The defendant was then arrested sometime later.

■■■ The first issue raised is whether the uncorroborated testimony of the defendant's accomplice was sufficient to find him guilty of burglary and theft beyond a reasonable doubt. Defendant argues that uncorroborated accomplice testimony is enough to convict if there is some independent evidence tending to show the defendant's guilt, citing *People v. Lawson* (1931), 345 Ill. 428, and *People v. Tsukas* (1950), 406 Ill. 613. Defendant posits that the State's evidence merely corroborates the fact that a crime occurred, not that the defendant committed it. He contends that the instant case is the same situation as that in *People v. Wilson* (1977),

66 Ill. 2d 346, wherein the defendant was convicted on the basis of the testimony of an alleged accomplice. The supreme court there reversed the defendant's conviction, noting the standard of proof beyond a reasonable doubt had not been met. It pointed to the fact there was no independent identification testimony other than that of the accomplice, who had admitted to instigating the offense and to the fact that the State's Attorney had promised the accomplice immunity. The State correctly contends that the law in Illinois is that the testimony of an accomplice, even if uncorroborated, is sufficient to warrant conviction if it satisfies the trier of fact beyond a reasonable doubt. (*People v. Wilson* (1977), 66 Ill. 2d 346; *People v. Glover* (1975), 27 Ill. App. 3d 827.) To be sure, such accomplice testimony is inherently weak and should be regarded cautiously since it may be self-serving in order to secure leniency or a deal, or because the accomplice may be testifying maliciously against the accused. A conviction obtained on the basis of uncorroborated accomplice testimony will not be reversed unless it is plainly apparent that the defendant was not proven guilty beyond a reasonable doubt. (*People v. Wilson*, at 349.) Although it is true that the only identification of the defendant as participating in the crime came from the accomplice, the accomplice had not been promised immunity, but in fact had pleaded guilty to theft of property valued over $150 the day before the defendant's trial. Defense counsel did not question the accomplice about why he had pleaded guilty to theft or why he was not also charged with burglary. Further, there was circumstantial evidence which tended to corroborate the accomplice's testimony against the defendant. Defense counsel presented witnesses who testified there were ill feelings between the accomplice and the defendant, and that they physically fought with one another on one occasion. However, there was also testimony that the defendant initially obtained the money to post the accomplice's bail. One witness testified he asked the defendant to do some work on his red pickup truck which had no wood sides on it. The defendant's neighbor testified, however, that on January 29 he saw the red truck parked at the apartment which the defendant and the accomplice shared, and that it had a "box" on it. Another witness, a farmer and an acquaintance of the accomplice, testified that during a discussion with the defendant and accomplice during the latter part of January, the defendant queried him on crop and livestock prices. The police officer who arrested the defendant testified the defendant was found at a residence in Mt. Carroll under a bed and up against the wall with his hands over his face.

The defendant did not testify, but presented witnesses who testified that defendant was with them at a bar and later at one of their homes on the night and during the early morning hours of January 30 and 31. There were various inconsistencies in the witnesses' testimony, and the credi-

bility of their testimony was for the jury to determine. The jury's verdict will not be disturbed unless it is necessary to prevent an apparent injustice. (*People v. Musgray* (1976), 37 Ill. App. 3d 48, 50.) The record does not disclose any such apparent injustice here. Consequently, we conclude the evidence here supports a finding that the defendant's guilt was established beyond a reasonable doubt.

■■ The next issue raised is whether the defendant was prejudiced by evidence of other offenses. In response to the prosecutor's question on direct examination: "Q. Do you know how the defendant happened to come up with this idea of stealing feeder cattle?" the accomplice answered: "A. Well, not really. But I've known that he's done it before." Defense counsel objected and moved the response be stricken. The court complied, directing the jury to disregard the comment. The defendant contends generally that the uncorroborated testimony of the accomplice combined with this prejudicial response cannot sustain a guilty verdict. In view of the fact that there was circumstantial evidence which tended to corroborate the accomplice's testimony as discussed above, the uninvited response did not unduly prejudice the defendant, and does not amount to reversible error. (*People v. DuPree* (1979), 69 Ill. App. 3d 260, 264; *People v. Naujokas* (1962), 25 Ill. 2d 32, 36.) The record does not indicate the State was attempting to elicit the improper comment. Further, defense counsel appeared satisfied that the court's prompt action in instructing the jury to disregard the response cured the error. No motion for a mistrial was made. The entire colloquy was very brief, and no undue attention was focused upon it. The defendant's conviction is not required to be reversed due to this claimed error.

The final issue raised is whether the prosecutor's argument constituted prejudicial reversible error. The defendant complains the prosecutor's closing argument so severely prejudiced the defendant that a reversal of his conviction is required. Defendant cites *People v. Moore* (1956), 9 Ill. 2d 224, for the proposition that where the argument is this prejudicial, no objection to the argument during trial need have been made in order to preserve the error on review. *Moore*, however, is distinguishable on its facts, since the prosecuting attorneys there went well beyond the record in characterizing the defendant as a "gunman" waging war on society, and in expressing their personal views and impressions of the case.

The general rule is that argument based upon the evidence or legitimate inferences drawn therefrom is permissible. (*People v. Boyle* (1979), 78 Ill. App. 3d 791, 799.) During argument, the prosecutor stated that defendant's neighbor had seen a red truck with a "rack" on it, rather than a "box" as stated during the witness' testimony. Defense counsel did not interpose an objection to this, and we do not believe the misstatement

was a material one. The witness' testimony as to the presence of a box on the truck was not distinguished by defense counsel on cross-examination from the rack which the defendant and his accomplice purportedly constructed in order to modify the truck for hauling livestock. Neither of the words used to describe the construction was very specific. Consequently, the interchange of the terms during the prosecutor's argument did not cause any prejudice to the defendant.

The defendant also charges the prosecutor unnecessarily prejudiced the defendant by referring to "Watergate people" during closing argument. This charge is specious, considering the prosecutor was responding in kind on rebuttal to defense counsel's closing argument that even though the defendant's witnesses weren't "ministers, bankers, or school teachers," their testimony was still worthy of belief. During rebuttal, the prosecutor extended the class of persons to include "* * * attorneys Watergate people * * *," in order to make the point that even persons generally regarded as being upstanding members of society can have incredible stories. It is well settled that where the comments of the prosecution are provoked by defense counsel's statements in closing argument, the defendant cannot claim that such comments were prejudicial and erroneous. (*People v. Braxton* (1980), 81 Ill. App. 3d 808.) For the same reason, the prosecutor's reference to the fact the defendant raised money to bond out the accomplice was not error. Defense counsel attempted to establish at trial that there was "bad blood" between the two men. The uncontradicted testimony that the defendant helped bond out the accomplice was highly inconsistent with this theory, and the prosecutor was well within the bounds of proper argument in pointing it out to the jury during rebuttal.

The final point raised by the defendant is that the testimony concerning the posture of the defendant upon his arrest was prejudicial. Indeed, the officer's testimony that the defendant was found cowering under a bed after police had knocked and announced their presence and searched the house was prejudicial, but it was not reversible error. In defendant's brief, it is incorrectly contended he may have been trying to protect a girl who was in the bedroom with him. This is not true. The record shows the defendant was in a bedroom with a girl on the prior occasion of the accomplice's arrest, not his own arrest. Similar to the cases which hold that evidence of flight from the scene of a crime is admissible and may be considered as a factor tending to show guilt (*People v. Ivy* (1979), 68 Ill. App. 3d 402), the posture of the defendant at the time of his arrest likewise may be considered a factor tending to show a consciousness of guilt where it appears the defendant's conduct was motivated by avoidance of capture.

In sum, the defendant has not shown that the language complained of

was a material factor in his conviction, and reversal is not warranted. *People v. Naujokas* (1962), 25 Ill. 2d 32.

The judgment of the circuit court of Carroll County is affirmed.

Judgment affirmed.

REINHARD and VAN DEUSEN, JJ., concur.